# EXHIBIT A

# APA

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE,

AND

WHS ENERGY SOLUTIONS, INC.

March 4, 2025

## TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ................................................................................................ 2

ARTICLE II. PURCHASE AND SALE ............................................................................ 9

    **Section 2.1**    **Purchase and Sale of Purchased Assets** .......................................... 9
    **Section 2.2**    **Excluded Assets** ............................................................................. 11
    **Section 2.3**    **Assumption of Assumed Liabilities** ................................................ 11
    **Section 2.4**    **Excluded Liabilities** ....................................................................... 12
    **Section 2.5**    **Consideration** ................................................................................. 12
    **Section 2.6**    **Assumption and Assignment of Contracts** ..................................... 12
    **Section 2.7**    **Closing** ........................................................................................... 14
    **Section 2.8**    **Deliveries at Closing** ...................................................................... 14
    **Section 2.9**    **Allocation** ....................................................................................... 15

ARTICLE III. SELLER'S REPRESENTATIONS AND WARRANTIES ..................... 15

    **Section 3.1**    **Authorization, No Conflicts, Etc** .................................................... 15
    **Section 3.2**    **Brokers' Fees** ................................................................................. 16
    **Section 3.3**    **No Outside Reliance** ...................................................................... 16

ARTICLE IV. BUYER'S REPRESENTATIONS AND WARRANTIES ..................... 16

    **Section 4.1**    **Organization of Buyer** ................................................................... 16
    **Section 4.2**    **Authorization of Transaction** ......................................................... 16
    **Section 4.3**    **Noncontravention** .......................................................................... 17
    **Section 4.4**    **Brokers' Fees** ................................................................................. 17
    **Section 4.5**    **No Outside Reliance** ...................................................................... 17

ARTICLE V. DISCLAIMERS; WAIVERS, RELEASES ............................................. 17

    **Section 5.1**    **Sale "As Is" "Where Is"; Release for Conditions** ..................... 17
    **Section 5.2**    **DISCLAIMER OF WARRANTIES FOR PURCHASED ASSETS** ...... 18
    **Section 5.3**    **DISCLAIMER REGARDING INFORMATION** ................................ 19
    **Section 5.4**    **DISCLAIMER AS TO TITLE TO ASSETS** ...................................... 19
    **Section 5.5**    **SOLE REMEDY; WAIVER OF TITLE** ............................................ 19
    **Section 5.6**    **CONSPICUOUSNESS** .................................................................... 20

ARTICLE VI. PRE-CLOSING COVENANTS .............................................................. 20

    **Section 6.1**    **Bankruptcy Court Actions** ............................................................. 20
    **Section 6.2**    **Commercially Reasonable Efforts** .................................................. 20
    **Section 6.3**    **Filings with Governmental Entities; Permits and Licenses** ............ 20

ARTICLE VII. OTHER COVENANTS .......................................................................... 21

    **Section 7.1**    **Cooperation** .................................................................................... 21
    **Section 7.2**    **Further Assurances; Turnover** ........................................................ 21
    **Section 7.3**    **Harbinger Matter** ........................................................................... 21
    **Section 7.4**    **Debtors' Customers Warranty Claims** ........................................... 22

i

ARTICLE VIII. CONDITIONS TO CLOSING ...................................................................22

**Section 8.1    Conditions to the Buyer's Obligations** .......................................22
**Section 8.2    Conditions to the Seller's Obligations** .......................................23
**Section 8.3    No Frustration of Closing Conditions** .........................................23
**Section 8.4    Waiver of Conditions** .....................................................................24

ARTICLE IX. TERMINATION ..........................................................................................24

**Section 9.1    Termination of Agreement** .............................................................24
**Section 9.2    Procedure upon Termination** ........................................................25
**Section 9.3    Effect of Termination** ......................................................................25

ARTICLE X. MISCELLANEOUS .....................................................................................26

**Section 10.1    Limitation of Liability** ....................................................................26
**Section 10.2    Expenses** ..........................................................................................26
**Section 10.3    Entire Agreement** ...........................................................................26
**Section 10.4    Incorporation of Schedules, Exhibits, and Schedules** ............26
**Section 10.5    Amendments and Waivers** ............................................................26
**Section 10.6    Succession and Assignment** .........................................................26
**Section 10.7    Notices** ..............................................................................................27
**Section 10.8    Governing Law; Jurisdiction** .......................................................27
**Section 10.9    Consent to Service of Process** .......................................................28
**Section 10.10   WAIVERS OF JURY TRIAL** ........................................................28
**Section 10.11   Severability** .....................................................................................28
**Section 10.12   No Third-Party Beneficiaries** .......................................................28
**Section 10.13   No Survival of Representations, Warranties, and Agreements** ............28
**Section 10.14   Non-Recourse** .................................................................................29
**Section 10.15   Construction** ...................................................................................29
**Section 10.16   Computation of Time** ....................................................................29
**Section 10.17   Mutual Drafting** ............................................................................29
**Section 10.18   Headings; Table of Contents** ........................................................30
**Section 10.19   Counterparts; Facsimile and Email Signatures** .......................30

ii

<u>EXHIBITS AND SCHEDULES</u>

<u>EXHIBITS</u>

Exhibit A ..........................................Form of Bill of Sale
Exhibit B..........................................Form of Sale Order (to be provided)

<u>SCHEDULES</u>

Schedule 2.3(c) ..................................Estimated Asset Removal Costs
Schedule 2.6(a) ..................................Assumed Contracts and Cure Costs
Schedule 2.6(e) ..................................Provisionally Designated Contracts

i

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of March ___, 2025 (the "Effective Date"), by and among Jeoffrey L. Burtch, not individually, but solely as the chapter 7 trustee (the "Seller") for the bankruptcy estates (the "Estates") of the Debtors (as defined below), and WHS Energy Solutions, Inc., a Delaware corporation (together with its permitted successors, designees, and assigns, the "Buyer" and collectively with the Seller, the "Parties").

## RECITALS

WHEREAS, on January 17, 2025 (the "Petition Date"), each of Canoo, Inc., a Delaware corporation, EV Global Holdco LLC, a Delaware limited liability company, EV US Holdco Inc., a Delaware corporation, Canoo Technologies Inc., a Delaware corporation, Canoo Manufacturing, LLC, a Delaware limited liability company and Canoo Sales, LLC, a Delaware limited liability company (such six legal entities, collectively, the "Debtors" and each, individually, a "Debtor") filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), thereby initiating the chapter 7 cases currently pending as, respectively, *In re Canoo Inc.,* Case No. 25-10094-BLS, *In re EV Global Holdco LLC,* Case No. 25-10095-BLS*, In re EV US Holdco Inc.,* Case No. 25-10096-BLS*, In re Canoo Manufacturing, LLC,* Case No. 25-10097-BLS*, In re Canoo Sales, LLC,* Case No. 25-10098-BLS and *In re Canoo Technologies Inc.,* Case No. 25-10099-BLS (collectively, the "Chapter 7 Cases" and each a "Chapter 7 Case");

WHEREAS, on or about the Petition Date, the United States Trustee has appointed the Seller as the interim chapter 7 trustee for the Estates, and, with the conclusion of the Section 341 Meeting of Creditors, the Seller now serves as the trustee under section 702(d) of the Bankruptcy Code (the "Chapter 7 Trustee");

WHEREAS, the Seller desires to sell, transfer, and assign to the Buyer, and the Buyer desires to purchase, acquire, and assume, pursuant to sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, the Seller intends to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing the Seller to consummate the Contemplated Transaction upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the Seller has determined, in the reasonable exercise of his business judgment, that it is advisable and in the best interest of the Estates and the beneficiaries thereof to consummate the Contemplated Transaction provided for herein pursuant to the Sale Order and has therefore approved this Agreement; and

WHEREAS, the Contemplated Transaction is subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order as entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I.
### DEFINITIONS

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means, when used with reference to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Asset Removal Costs" means (a) (i) the costs and obligations to remove any Purchased Assets from the real property located at 4461 Zarrow Street, Pryor, OK 74361 (the "Pryor Location"), (ii) the costs and obligations to repair damage to and otherwise clean-up the leased real property at the Pryor Location in accordance with the real estate lease therefore (the "Pryor Lease"), and (iii) the rent and other payment obligations of the Debtors under the Pryor Lease solely for the period beginning on the Petition Date and ending on the date the removal, repair and clean-up contemplated by the foregoing clauses (i) and (ii) are completed; (b) (i) the costs and obligations to remove any Purchased Assets from the real property located at 15520 Highway 114, Justin, TX 76247 and 15306 Highway 114, Justin, TX 76247 (the "Justin Locations") and (ii) the costs and obligations to repair damage to and clean-up the leased real property at the Justin Locations in accordance with the real estate lease therefore; (c) without duplication of any of the foregoing, the costs of removal and storage of any Purchased Assets wherever located, including, without limitation, at sites hosted by Scan Global Logistics in California and Texas; and (d) any and all costs associated with transferring or assigning any Purchased Asset to Buyer at or subsequent to the Closing.  An estimate of the Asset Removal Costs is set forth on Schedule 2.3(c).

"Assumed Contracts" has the meaning set forth in Section 2.6(a).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bill of Sale" means that certain Bill of Sale in form attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Express Representations" has the meaning set forth in Section 3.3.

"Buyer Preference Claims" means any and all claims that could be asserted by or on behalf of any Debtor pursuant to Section 547 of the Bankruptcy Code or any analogous State Law for transfers expressly set forth in the Debtors' Statements of Financial Affairs against any of the following individuals and entities: Anthony Aquila, Kunal Bhalla, Ramesh Murthy, Sean Yan, AFV Partners LLC, Aquila Family Ventures, LLC, 15520 HWY 114 LLC, 15306 HWY 114 LLC, and I-40 OKC Partners, LLC.

"Chapter 7 Case" and "Chapter 7 Cases" have the meanings set forth in the Recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the closing of the Contemplated Transaction.

"Closing Date" means the date on which the Closing actually occurs.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver, or authorization from a Governmental Entity, or an Order of the Bankruptcy Court that deems or renders any of the foregoing unnecessary.

"Contemplated Transaction" means the sale to the Buyer, and the purchase by the Buyer, of the Purchased Assets pursuant to, and in accordance with, this Agreement, the Related Agreements, and the Sale Order.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement, or other arrangement, understanding, permission, or commitment that, in each case, is legally-binding.

"Credit Bid" means a credit bid pursuant to Section 363(k) of the Bankruptcy Code of all of the outstanding Obligations owed to the Lender (as set forth in the Debtors' bankruptcy schedules totaling in excess of $11 million) by any Estate, any Debtor or the Chapter 7 Trustee pursuant to the Revolving Credit Agreement. For purposes of this defined term, "Obligations" and "Lender" shall have the meanings ascribed to such terms in the Revolving Credit Agreement.

"Cure Amounts" means, with respect to an Assumed Contract, the amounts necessary to cure all defaults and to pay all actual pecuniary losses as of the Closing Date to the extent required by section 365(b)(1)(A) and (B) of the Bankruptcy Code and any Order of the Bankruptcy Court.

"Debtor" and "Debtors" have the meanings set forth in the preamble.

"Effective Date" has the meaning set forth in the preamble.

"Equity Interest" means with respect to any Person, (a) any share of common or preferred stock, partnership or membership interest, unit of participation, securities or agreements providing for profit participation features, including so-called "profits interests", equity appreciate rights, phantom equity or similar rights to participate in the profits, or other similar interest (however designated in such Person (including, in each case, any equivalent securities or interests in a foreign Person) and (b) any warrant, option, purchase or subscription right, conversion right, exchange right or other agreement or security which would entitle any other Person to acquire any such interest described in the foregoing clause (a) in another Person.

"Estate" and "Estates" have the meanings set forth in the preamble.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Foreign Subsidiary Equity Interests" means (a) the Equity Interests of EV Global Ltd, a Cayman Islands exempt company, held by EV Global Holdco LLC, (b) the Equity Interests of Canoo Nederland B.V., a besloten vennootshap organized under the laws of The Netherlands, held by EV Global Holdco LLC, and (c) the Equity Interests of Canoo Technologies UK Limited, a company limited by shares organized under the laws of the United Kingdom, held by EV Global Holdco LLC.

"Fundamental Representations" means Section 3.1 (Authorization, No Conflicts, Etc.), and Section 3.2 (Brokers' Fees).

"GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

"Governmental Approvals" means any authorization, consent, approval, license, ruling, permit, exemption, variance, order, judgment, decree, guidance, policy, declaration of or regulation by any Governmental Entity relating to the execution, delivery or performance of this Agreement or any Related Agreement.

"Governmental Contract" means any Contract to which a Governmental Entity is a party.

"Governmental Entity" means any United States federal, state, or local or non-United States governmental, quasi-governmental or regulatory authority, agency, commission, court, body, or other governmental entity.

"Harbinger Matter" means that certain Litigation in the United States District Court for the Central District of California, Western Division currently pending as *Canoo Technologies, Inc. vs. Harbinger Motors, Inc. et al, Case No. 2:22-cv-09309-FLA-JC* and any related Litigation based or that may be based on the facts and circumstances alleged thereunder.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond (surety or otherwise), and other forms of insurance owned or held by or on behalf, or providing insurance or bonding coverage to, the Estates or any Debtor.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, whether finished or in progress, including all: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) service marks, brand names, Internet domain names, social media accounts or "handles," logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, work for hire, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in electronic data processing systems, information management systems, recordkeeping systems, communications and telecommunications systems, networking systems, account management systems, Internet websites and related content, inventory management systems and other such applications, software, hardware, equipment and services (including any firmware, applications and software installed on such hardware and equipment, and all associated databases, and related documentation); (e) trade secrets and proprietary or confidential information relating to the Purchased Assets; and (f) any other intellectual property rights held by the Seller or by others pursuant to contracts with Seller related to the Purchased Assets.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign, or international, multinational, or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion, or requirement issued, enacted, adopted, promulgated, implemented, or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health, and safety and other land use Laws.

"Liability" means, as to any Person, any debt, Claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), assessment, cost, expense, loss, expenditure, tax, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as that term is defined in section 101(37) of the Bankruptcy Code), encumbrance, right, demand, charge, hypothecation, statutory or deemed trust, mortgage, deed of trust, right to purchase, option, right of first of refusal, pledge, security interest or similar interest, title defect, hypothecation, easement, license, right of way, servitude, encroachment, judgment, conditional sale or other title retention agreements and other similar impositions, imperfection or defect of title or restriction on transfer or use (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or

unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 7 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability, alter ego, or veil piercing).

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, mediation, arbitration, audit, grievance, demand, hearing, proceeding or investigation, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity, arbitrator, or mediator.

"<u>LSVTH</u>" means Debtors' business as a Tier-1 supplier to OEMs or other large direct purchasers for production of lifestyle people transport vehicles.

"<u>Material Adverse Effect</u>" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances, or occurrences) since the date of this Agreement, that (a) has had, or would reasonably be expected to have, a material adverse effect on the Purchased Assets (taken as a whole), (b) would reasonably be expected to prevent or materially delay beyond the Outside Date or materially impair the Seller's ability to consummate the transactions contemplated by this Agreement or (c) has had, or would be reasonably expected to have, a material adverse effect on the validity or enforceability of this Agreement and the Related Agreements or the rights and remedies of the Seller under this Agreement and the Related Agreements; *provided, however*, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) the filing, announcement, pendency, or administration of the Chapter 7 Cases, including (1) any Order of the Bankruptcy Court that is not in violation of this Agreement or the Sale Order, (2) any action or omission of the Seller taken or not taken in order to comply with, avoid violation of, or resolve issues concerning any Order or objections filed with the Bankruptcy Court that is not in violation of this Agreement or the Sale Order, (3) the sale process for the Purchased Assets, or (4) anything directly or indirectly related thereto; (ii) any actions or omissions required by this Agreement and the Related Agreements; (iii) any actions taken by or at the request of the Buyer or any of its Affiliates; or (iv) the negotiation, announcement, or pendency of this Agreement or the consummation of the Contemplated Transaction or the identity, nature, or ownership of the Buyer or its Affiliates.

"<u>Net Harbinger Recovery</u>" means (i) the sum of all amounts paid to the Seller, Debtors or Estates, or one or more of their respective designees, under the Harbinger Matter, by or on behalf of one or more of the defendants party thereto, or any other Person that may become party to the Harbinger Matter as a defendant thereunder, as a direct result of or otherwise in settlement of the Harbinger Matter, *less* (ii) the sum of all legal and professional fees and costs paid to contingency counsel in pursuing, prosecuting and/or settling such Harbinger Matter.

"<u>Order</u>" means any order, judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order, or any other order of any Governmental Entity.

"<u>Organizational Documents</u>" means, with respect to any entity, the certificate of incorporation, articles of incorporation, certificate of formation, articles of organization, by-laws, partnership agreement, limited liability company agreement, formation agreement, or other similar organizational or organic documents of such entity (in each case, as amended through the date of this Agreement).

"<u>Outside Date</u>" means April 14, 2025.

"<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Permit</u>" means any and all approvals, permits (including environmental, construction and operation permits), licenses, registrations, certificates, variances, Consents, exemptions, or similar rights issued, granted, given, or otherwise obtained or required to be obtained, from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"<u>Petition Date</u>" has the meaning set forth in the Recitals.

"<u>Provisionally Designated Contracts</u>" has the meaning set forth in Section 2.6(e).

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.1</u>; *provided, however*, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets.

"<u>Records</u>" means the books and records related to the Purchased Assets wherever situated and whether in hard copy, electronic format, or in any other medium.

"<u>Related Agreements</u>" means the Bill of Sale, any Assignment and Assumption Agreements, and any other instruments of transfer and conveyance required or reasonably necessary to convey valid title of the Purchased Assets to the Buyer pursuant to this Agreement and the Sale Order and any other agreement executed in connection with the Closing.

"<u>Revolving Credit Agreement</u>" means that certain Revolving Credit Agreement, dated as of November 5, 2024, by and between AFV Management Advisors, LLC and Canoo, Inc. (as amended through the date of this Agreement).

"<u>Representative</u>" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel, accountants, and other such professionals), and any other agents thereof.

ACTIVE 707194305v6

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 7 Cases, in form and substance as attached as Exhibit B hereto and with any revisions thereto being reasonably acceptable to the Seller and the Buyer, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing the Seller to consummate the sale to the Buyer in accordance with this Agreement.

"Sale Order Deadline" means April 7, 2025.

"Secured Parties" means the secured parties under the Revolving Credit Agreement.

"Seller" has the meaning set forth in the preamble.

"Seller Express Representations" has the meaning set forth in Section 4.5.

"Seller's Knowledge" (or words of similar import) means the actual knowledge of the Chapter 7 Trustee (it being acknowledged that the Chapter 7 Trustee has no personal knowledge of the Debtors or their assets aside from knowledge gained during his appointment as Chapter 7 Trustee for the Estates).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means (a) any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, unclaimed property, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed, and (b) any Liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's taxes as a transferee or successor, by contract or otherwise.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" means any stamp, documentary, registration, transfer, real estate transfer, use, sales, added-value, or similar Tax imposed under any applicable Law in connection with the Contemplated Transaction.

"Treasury Regulations" means regulations promulgated by the United States Department of Treasury under the IRC.

"Top Hat Warehousing and License Agreement" means that certain Warehousing and License Agreement in form and substance reasonably satisfactory to the Seller and Buyer to be executed at Closing. Such agreement shall provide that Buyer will collect and warehouse all physical assets associated with Debtors' LSVTH business for a period of at least 6 months following the Closing Date at Buyer's sole cost and expense. If the Chapter 7 Trustee determines in his sole and absolute discretion to convert the Chapter 7 Cases to Chapter 11 cases such that the reorganized Debtors can pursue the LSVTH business, Buyer will (i) license to such reorganized Debtors the technology (that it possesses) necessary or useful to pursue such business on a non-transferable royalty-free basis until such business has sold 50,000 units, and thereafter on a royalty basis of 1.5% of sales, (ii) provide such space and technical and production support as may be requested by such reorganized Debtors (at cost) until such 50,000 unit production milestone has been met. For the avoidance of doubt, if the Chapter 7 Trustee has not converted the Chapter 7 Cases to Chapter 11 cases prior to the 6-month anniversary of the Closing Date, Buyer shall have no obligation to provide any license or support and shall retain full title and interest to the collected and warehoused assets.

ARTICLE II.
PURCHASE AND SALE

Section 2.1    Purchase and Sale of Purchased Assets. Subject to the terms and conditions set forth in this Agreement, at the Closing, the Buyer shall purchase, acquire and accept, and the Seller shall cause the Estates and the Debtors to sell, transfer, assign, convey and deliver to the Buyer, all of the Estates' or the Debtors' right, title and interest in, all rights, properties and assets of the Estates or the Debtors (of every kind and description, whether direct or indirect, real, personal or mixed, tangible or intangible, wherever situated, whether or not carried or reflected on the books and records of the Estates or the Debtors), other than the Excluded Assets, free and clear of Claims, Liens and Liabilities, other than Assumed Liabilities (the "Purchased Assets"), including, without limitation:

      (a)     all tangible personal property, including, without limitation, all of Debtors' or the Estates' machinery and tools (whether completed or in progress), computers, equipment, vehicles, trailers and any other titled assets, equipment, supplies, and telephones;

      (b)     all Intellectual Property;

(c)    all intangible property rights, including without limitation, all of the Debtors' or the Estates' telephone numbers, fax numbers, e-mail addresses, websites, URLs, Internet domain names, corporate names and social media accounts or "handles" relating in any manner to the Purchased Assets;

(d)    all rights and interests under easements, rights-of-way and other instruments creating similar rights;

(e)    all Governmental Approvals and Permits owned or possessed, but only to the extent such Governmental Approvals and Permits may be transferred under applicable Law;

(f)    all Assumed Contracts;

(g)    all security or similar deposits paid or otherwise held in respect of any Assumed Contract;

(h)    all Records, including Records related to Taxes paid or payable relating in any manner to the Purchased Assets (provided that the Seller is entitled to retain copies of all Records and the Buyer will provide all such Records to the Seller at no charge), but excluding any materials exclusively related to any Excluded Assets;

(i)    all goodwill associated with the Purchased Assets, including goodwill associated with the Intellectual Property owned by the Estates or the Debtors and all rights under any confidentiality agreements executed by any third party for the benefit of the Estates or the Debtors to the extent relating to the Purchased Assets or the Assumed Liabilities (or any portion thereof), but excluding any confidentiality agreements relating solely to the retention of professionals by the Estates;

(j)    all rights under or pursuant to all warranties, representations, and guarantees made by suppliers, manufacturers, contractors, and any other Person to a Debtor or an Estate relating to any Purchased Asset or any Assumed Liability;

(k)    10% of any Net Harbinger Recovery;

(l)    the Foreign Subsidiary Equity Interests;

(m)    the Buyer Preference Claims (only to the extent that the individual or entity receiving such transfers waive any claims against the Estates);

(n)    all inventory; and

(o)    all other assets in connection with, relating to or necessary for, or used in the operation of, the Purchased Assets (but, for the avoidance of doubt, excluding the Excluded Assets).

Section 2.2    Excluded Assets. The following assets, properties, and rights of the Debtors or the Estates shall be retained by the Estates and are not being sold to the Buyer hereunder (the "Excluded Assets"):

(a)    all bank or other accounts of the Seller, Debtors, or Estates, including Debtors' cash collateral account securing Debtors' obligations to Silicon Valley Bank pursuant to a letter of credit issued by such bank;

(b)    all cash and cash equivalents of the Seller, Debtors, or Estates;

(c)    all accounts receivable of the Seller, Debtors, or Estates reflected on the Seller's, such Debtor's or such Estate's books and records on or before the Closing Date, including, for the avoidance of doubt, any proceeds of the auction of Debtors' property conducted on February 6, 2025 by Bid-it-Up;

(d)    all rights arising from, in respect of, or relating to any refunds due from federal, state, or local Governmental Entities with respect to Taxes of the Seller, Debtors, or Estates;

(e)    all directors and officers liability policies, and all proceeds, reserves, benefits, rebates, rights, or claims under any Insurance Policy (provided that (i) the rights of individual beneficiaries to make claims under the Debtors' directors' and officers' liability insurance policy shall not be abridged or restricted and (ii) the rights and benefits of pre-paid bonds in place to guarantee performance under any Assumed Liability shall not be an Excluded Asset);

(f)    all Leases and Contracts, other than the Assumed Contracts;

(g)    all claims and causes of action (and proceeds thereof), including those in connection with or under Chapter 5 of the Bankruptcy Code or similar state laws, and including those against former directors or officers of the Debtors (other than the Buyer Preference Claims); subject, in the case of the Harbinger Matter, to Section 2.1(k) and Section 7.3;

(h)    all Equity Interests issued by a Debtor that are held or owned by another Debtor (not including, for the avoidance of doubt, the Foreign Subsidiary Equity Interests);

(i)    a copy of all Records necessary to wind up the Estates;

(j)    assets subject to the Top Hat Warehousing and License Agreement; and

(k)    the rights, defenses, claims and causes of action of the Seller, Estates and Debtors under this Agreement and the Related Agreements and all consideration payable or deliverable to Seller under this Agreement.

Section 2.3    Assumption of Assumed Liabilities. On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, the Buyer shall assume (and from

11

and after the Closing pay, perform, discharge, or otherwise satisfy), and the Seller shall cause the Estates and Debtors to irrevocably convey, transfer, and assign to the Buyer, only the following Liabilities, without duplication and only to the extent not paid or settled prior to the Closing, and no other Liabilities (collectively, the "Assumed Liabilities"):

(a)    Liabilities under Assumed Contracts only to the extent such Liabilities (i) arise and accrue from and after the Closing Date and (ii) do not arise from or relate to any fact, circumstance, actual or alleged breach of contract, breach of warranty, violation of law, tort, infringement, failure to perform, improper performance, default or any Litigation, in each case with respect to this clause (ii), arising as of, or related to the period prior to, Closing;

(b)    Cure Amounts (for all Assumed Contracts); and

(c)    the Asset Removal Costs.

Section 2.4    Excluded Liabilities. Notwithstanding anything to the contrary set forth herein, the Buyer shall not assume and shall be deemed not to have assumed, and the Debtors and the Estates shall be solely and exclusively liable with respect to all Liabilities thereof, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (collectively, the "Excluded Liabilities").

Section 2.5    Consideration. Consideration for the sale and transfer of the Purchased Assets under this Agreement (the "Purchase Price") shall be composed of the following:

i.    the Credit Bid; *plus*

ii.    cash in the amount of three million dollars five hundred thousand ($3,500,000) for distribution in accordance with the Bankruptcy Code; *plus*

iii.    the assumption by the Buyer of the Assumed Liabilities through one or more Assignment and Assumption Agreements; *plus*

iv.    cash in the amount of five hundred thousand ($500,000) in consideration of the Buyer Preference Claims.

Section 2.6    Assumption and Assignment of Contracts.

(a)    Schedule 2.6(a) hereto sets forth a list of all Contracts, Leases and Permits for assumption and assignment to the Buyer, effective on and as of the Closing (such Contracts and Leases, the "Assumed Contracts"), together with the estimated Cure Amounts thereof. Subject to Section 2.6(e) below, any Contracts, Leases and Permits not listed on Schedule 2.6(a) shall not be assumed by and assigned to the Buyer, *provided*, *however*, notwithstanding anything to the contrary contained in this Agreement, the Buyer shall have the right to notify the Seller of (x) any Contract, Lease or Permit that it does not wish to assume or (y) any Contract, Lease or Permit to which a Debtor or an Estate is a party or beneficiary of that the Buyer wishes to add as an Assumed Contract up to ten (10) days prior to the Closing Date, and (i) any such previously considered Assumed

Contract that the Buyer no longer wishes to assume shall be automatically deemed removed from Schedule 2.6(a) and automatically deemed an Excluded Asset, without any adjustment to the Purchase Price (other than by reduction of the assumed Cure Amounts), and (ii) any such previously considered excluded Contract, Lease or Permit that the Buyer wishes to assume as an Assumed Contract shall be automatically deemed added to Schedule 2.6(a) and automatically deemed a Purchased Asset, without any adjustment to the Purchase Price (other than by increase of the assumed Cure Amounts).

(b)     In connection with the assumption by and assignment to the Buyer of any Assumed Contracts, (i) the Buyer shall comply with section 365(b)(1) of the Bankruptcy Code by paying such Cure Amounts to the counterparties of the Assumed Contracts at Closing; and (ii) the Buyer shall provide adequate assurance of future performance sufficient to satisfy the conditions contained in section 365(b)(1)(C) and (f) of the Bankruptcy Code with respect to Assumed Contracts.

(c)     Notwithstanding the foregoing, but subject to ARTICLE VI, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, the Buyer to the extent that such Contract (i) is rejected by the Seller or terminated by the Seller in accordance with the terms hereof, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, or (ii) relates solely to Excluded Assets.

(d)     Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement or in any Related Agreement shall be construed as an attempt to assign or the transfer or assignment of any Governmental Contract or Permit to Buyer that by its terms or by applicable Law is not assignable or transferable without Governmental Approval, unless and until such Governmental Approval has been obligation.  If a Governmental Contract or Permit is intended to be an Assumed Contract hereunder, but the Governmental Approval to allow the assignment or transfer of such Governmental Contract or Permit has not been obtained as of the Closing Date, then following the Closing, Seller and Buyer, at their own respective cost and expense, shall continue to cooperate to attempt to receive such Governmental Approval to allow such Governmental Contract or Permit to become an Assumed Contract and transfer to Buyer after the Closing.

(e)     The Buyer may on Schedule 2.6(e) designate Contracts that it has not yet determined that it wishes to become Assumed Contracts ("Provisionally Designated Contracts"), and shall have the right for thirty (30) days following the Closing to advise Seller in writing whether or not it wishes to assume any of such Provisionally Designated Contracts and have them become Assumed Contracts.  For such thirty-day period, the Seller agrees not to reject any Provisionally Designated Contract unless Seller is advised in writing by Buyer whether or not it wishes to assume such Contract, provided that Buyer agrees to reimburse and indemnify the Seller against any additional cost incurred by Seller as a result of delaying the determination with respect to such Provisionally Designated Contracts.  Notwithstanding the foregoing, it is understood and agreed between the Parties that the Sales Agreement dated as of October 15, 2021 by and between Panasonic Industrial Devices Sales Company of America, Division of Panasonic Corporation of

North America, SANYO Electric Co., Ltd., acting through its Mobility Energy Business Division, and Canoo Technologies Inc., as amended, shall not be an Assumed Contract or a Provisionally Designated Contract and that Buyer is not acquiring any rights that Debtors may have with respect to such contract including without limitation the rights with respect to the $30 million deposit listed in the Debtors' bankruptcy schedules.

Section 2.7    Closing. The Closing shall take place remotely by electronic exchange of electronic documents and signatures (or wet signatures, to the extent required) on the second (2nd) Business Day after the date on which all conditions to the obligations of the Seller and the Buyer to consummate the Contemplated Transaction set forth in ARTICLE VIII (other than conditions with respect to actions the Seller or the Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived by the party entitled to waive that condition, or at such other place, time or on such other date as shall be mutually agreed upon by the Seller and the Buyer beforehand; provided that, to the extent possible, the Parties hereby agree to have the Closing occur on the date on which the Sale Order has been entered by the Bankruptcy Court.   The Closing shall be deemed to have occurred, for purposes of this Agreement at 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

Section 2.8    Deliveries at Closing.

(a)    At the Closing, the Seller shall deliver to the Buyer the following documents and other items, duly executed by the Seller (as applicable):

i.    the Sale Order;

ii.    the Bill of Sale;

iii.    all Assignment and Assumption Agreements, in each case, as reasonably requested by the Buyer;

iv.    the Top Hat Warehousing and License Agreement;

v.    IRS Form W-9 for Seller, Debtors and Estates, as reasonably requested by the Buyer; and

vi.    such other assignments, instruments and writings reasonably requested by Buyer to evidence the transfer, assignment or conveyance of the Purchased Assets to the Buyer as contemplated by this Agreement.

(b)    At the Closing, and in addition to the Purchase Price, the Buyer shall deliver to the Seller the following documents and other items, duly executed by the Buyer (as applicable):

i.    the Bill of Sale;

ii.    any and all Assignment and Assumption Agreements that were requested by the Buyer;

14

iii.      the Top Hat Warehousing and License Agreement; and

iv.      such other assignments, instruments and writings that were reasonably requested by Seller to evidence the transfer, assignment or conveyance of the Purchased Assets to the Buyer as contemplated by this Agreement.

Section 2.9    <u>Allocation</u>. Within one hundred twenty (120) calendar days after the Closing Date, the Buyer shall in good faith prepare and deliver to the Seller an allocation of the Purchase Price among the applicable Purchased Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States, state, local or non-United States Law, as appropriate). The Buyer and the Seller shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation. Neither the Buyer nor the Seller shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation; *provided* that nothing contained herein shall prevent the Buyer or the Seller from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of such allocation, and neither the Buyer nor the Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging the allocation.

ARTICLE III.
<u>SELLER'S REPRESENTATIONS AND WARRANTIES</u>

For the avoidance of doubt, (A) except in the case of fraud by any Person, the Buyer agrees to accept the economic condition of the Purchased Assets on an "As Is-Where Is" basis subject to the terms of this Agreement and the Related Agreements, (B) each of the covenants and agreements (solely to the extent such covenant or agreement contemplates or requires performance to be completed by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such covenant or agreement or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing (it being agreed that all such rights, remedies, recourse and entitlements are hereby expressly waived and released to the fullest extent permitted by Law effective immediately as of the Closing) in the absence of willful misconduct, intentional misconduct or fraud, and (C) in the absence of willful misconduct, intentional misconduct or fraud, in the event of a breach of any representation or warranty by the Seller, the Buyer's sole remedy with respect to such breach is termination of this Agreement in accordance with <u>ARTICLE IX</u> of this Agreement. The Seller represents and warrants to the Buyer as follows:

Section 3.1    <u>Authorization, No Conflicts, Etc</u>. The Seller is the Chapter 7 Trustee for the Estates of the Debtors. The Seller, subject to the entry and effectiveness of the Sale Order, has full power and authority to execute and deliver this Agreement, all Related Agreements to which he is a party and all other agreements, instruments, and documents contemplated hereby and thereby and to perform its obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and all other Related Agreements to which the Seller is a party have been duly authorized by the Seller, subject to entry of the Sale Order, and no other action on the part of the Seller is necessary to authorize this Agreement or the Related Agreements to which he is a party or to consummate the Contemplated Transaction. Subject to the entry and effectiveness of the Sale

15

Order, this Agreement has been duly and validly executed and delivered by the Seller and (assuming this Agreement constitutes a valid and legally binding obligation of the Buyer and upon the entry and effectiveness of the Sale Order) constitutes a valid and legally binding agreement of the Seller, enforceable against the Seller in accordance with its terms.

Section 3.2    Brokers' Fees. Neither the Seller nor any Estate has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transaction and there is no investment banker, broker, finder or other such intermediary that is entitled to a fee or commission in connection with Contemplated Transactions.

Section 3.3    No Outside Reliance. Notwithstanding anything contained in this ARTICLE III or any other provision of this Agreement to the contrary, the Seller acknowledges and agrees that the representations and warranties made by the Buyer to the Seller in ARTICLE IV (as qualified by ARTICLE V below and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Buyer Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made by the Buyer to the Seller in connection with the Contemplated Transaction.

ARTICLE IV.
BUYER'S REPRESENTATIONS AND WARRANTIES

The Buyer represents and warrants to the Seller as follows:

Section 4.1    Organization of Buyer. The Buyer is a corporation, duly formed and validly existing under the Laws of the State of Delaware and has all requisite power and authority to own and operate its assets and to carry on its business as now being conducted.

Section 4.2    Authorization of Transaction.

(a)    The Buyer has full power, capacity and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which the Buyer is a party have been duly authorized by the Buyer, and no other action on the part of the Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transaction.

(c)    This Agreement has been duly and validly executed and delivered by the Buyer. This Agreement constitutes a valid and legally binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. To the extent each Related Agreement constitutes a valid and legally-binding obligation of the Seller party thereto, each Related Agreement to which the Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy,

16

insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

Section 4.3    Noncontravention. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transaction (including the assignments and assumptions referred to in Section 2.6) will (i) conflict with or result in a breach of the certificate of incorporation, operating agreement, or other Organizational Documents, of the Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which the Buyer is, or its assets or properties are subject, (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel any Contract to which the Buyer is a party or by which it is bound, or such filings, approvals and consents as may be necessary to assume any Permits or Governmental Contracts, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations or rights as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of the Buyer to consummate the Contemplated Transaction or the Related Agreements.

Section 4.4    Brokers' Fees. Neither the Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transaction for which the Seller could become liable or obligated to pay.

Section 4.5    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, the Buyer acknowledges and agrees that the representations and warranties made by the Seller to the Buyer in ARTICLE III (as qualified by ARTICLE V below and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Seller Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made by the Seller to the Buyer in connection with the Contemplated Transaction.

ARTICLE V.
DISCLAIMERS; WAIVERS, RELEASES

Section 5.1    Sale "As Is" "Where Is"; Release for Conditions.

(a)    NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, THE BUYER AND THE SELLER ACKNOWLEDGE AND AGREE THAT THE SELLER HAS ACQUIRED THE ESTATES' INTEREST IN THE PURCHASED ASSETS IN THE CAPACITY OF BANKRUPTCY TRUSTEE. THE SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION OTHER THAN SELLER EXPRESS REPRESENTATIONS.

(b)    THE BUYER REPRESENTS THAT IT HAS COMPLETED ITS DILIGENCE, INSPECTION, INVESTIGATION, OR REVIEW, AND HAS BE GIVEN ACCESS TO INFORMATION AND THE OPPORTUNITY TO CONDUCT DILIGENCE, INSPECTION, INVESTIGATION, AND REVIEW. THE BUYER HAS RELIED UPON ONLY (I) ITS OWN INDEPENDENT DILIGENCE, REVIEW, INVESTIGATION, OR INSPECTION IN EXECUTING THIS AGREEMENT AND

17

CONSUMMATING THE CONTEMPLATED TRANSACTION, (II) INFORMATION PROVIDED BY THE SELLER AND (III) THE SELLER EXPRESS REPRESENTATIONS.

(c)    EXCEPT IN THE CASE OF INTENTIONAL MISCONDUCT, WILLFUL MISCONDUCT OR FRAUD BY ANY PERSON, THE BUYER AGREES TO ACCEPT THE ECONOMIC CONDITION OF THE PURCHASED ASSETS ON AN "AS IS-WHERE IS" BASIS SUBJECT TO THE TERMS OF THIS AGREEMENT AND THE RELATED AGREEMENTS.

(d)    THE BUYER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION OTHER THAN THE BUYER EXPRESS REPRESENTATIONS.

Section 5.2    DISCLAIMER OF WARRANTIES FOR PURCHASED ASSETS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT AND THE RELATED AGREEMENTS (IT BEING UNDERSTOOD THAT THE BUYER HAS RELIED UPON SUCH REPRESENTATIONS AND WARRANTIES) AND WILLFUL MISCONDUCT, INTENTIONAL MISCONDUCT OR FRAUD BY ANY PERSON, THE BUYER ACKNOWLEDGES THAT NONE OF THE SELLER, ANY ESTATE, OR ANY PERSON ACTING ON BEHALF OF THE SELLER OR ANY ESTATE, HAS MADE, AND THE BUYER ACKNOWLEDGES THE EXPRESS DISCLAIMER AND NEGATION, OF ANY OTHER SUCH REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, RELATING TO THE CONDITION OF ANY IMMOVABLE PROPERTY, MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY, FIXTURES AND PERSONAL PROPERTY CONSTITUTING PART OF THE PURCHASED ASSETS, INCLUDING (a) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (b) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (c) ANY IMPLIED OR EXPRESS WARRANTY OF CONFORMITY TO MODELS OR SAMPLES OF MATERIALS, (d) ANY RIGHTS OF THE BUYER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, (e) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT, (f) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM REDHIBITORY VICES OR DEFECTS OR OTHER VICES OR DEFECTS, WHETHER KNOWN OR UNKNOWN, AND (g) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW NOW OR HEREAFTER IN EFFECT, IT BEING THE EXPRESS INTENTION THAT THE IMMOVABLE PROPERTY, MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY, FIXTURES AND PERSONAL PROPERTY SHALL BE CONVEYED TO THE BUYER AS IS AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR, WITH ALL FAULTS, AND THE BUYER REPRESENTS TO THE SELLER AND ESTATE THAT THE BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS WITH RESPECT TO THE IMMOVABLE PROPERTY, MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY, FIXTURES AND PERSONAL PROPERTY AS THE BUYER DEEMS APPROPRIATE AND THE BUYER WILL ACCEPT THE IMMOVABLE PROPERTY, MOVABLE PROPERTY, EQUIPMENT, INVENTORY, MACHINERY, FIXTURES AND PERSONAL PROPERTY AS IS, IN THEIR PRESENT CONDITION AND STATE OF REPAIR, WITH ALL FAULTS.

Section 5.3    <u>DISCLAIMER REGARDING INFORMATION</u>.

(a)    IT IS EXPRESSLY NEGATED AND DISCLAIMED, AND THE BUYER HEREBY WAIVES, AND ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE RELATED AGREEMENTS (IT BEING UNDERSTOOD THAT THE BUYER HAS RELIED UPON THE SELLER EXPRESS REPRESENTATIONS) AND FOR WILLFUL MISCONDUCT, INTENTIONAL MISCONDUCT OR FRAUD BY ANY PERSON, NONE OF THE SELLER, ANY ESTATE, OR ANY PERSON ACTING ON BEHALF OF THE SELLER OR ANY ESTATE HAS MADE, AND THE BUYER IS NOT RELYING UPON, ANY STATEMENT, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OR OTHER ASSURANCE RELATING TO (a) THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR VERBAL) NOW, HERETOFORE, OR HEREAFTER FURNISHED TO THE BUYER BY OR ON BEHALF OF THE SELLER OR THE ESTATE, OR (b) THE HISTORICAL, CURRENT OR FUTURE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES, CONTRACTS, AND PROSPECTS OF THE SELLER, OR ANY ESTATE.

(b)    IT IS EXPRESSLY NEGATED AND DISCLAIMED, AND THE SELLER, ON HIS OWN BEHALF HEREBY WAIVES, AND ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE RELATED AGREEMENTS (IT BEING UNDERSTOOD THAT THE SELLER HAS RELIED ONLY UPON THE BUYER EXPRESS REPRESENTATIONS), THE BUYER HAS NOT MADE, AND THE SELLER IS NOT RELYING UPON, ANY STATEMENT, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OR OTHER ASSURANCE RELATING TO (a) THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR VERBAL) NOW, HERETOFORE, OR HEREAFTER FURNISHED TO THE SELLER BY OR ON BEHALF OF THE BUYER OR (b) THE HISTORICAL, CURRENT OR FUTURE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES, CONTRACTS, AND PROSPECTS OF THE BUYER.

Section 5.4    <u>DISCLAIMER AS TO TITLE TO ASSETS</u>. EXCEPT FOR THE SELLER EXPRESS REPRESENTATIONS, THE SELLER SHALL CONVEY THE SELLER'S AND THE ESTATES' INTERESTS IN AND TO THE PURCHASED ASSETS TO THE BUYER WITHOUT ANY WARRANTY OF TITLE.

Section 5.5    <u>SOLE REMEDY; WAIVER OF TITLE</u> . THE BUYER HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS OR REMEDIES AGAINST THE SELLER, EACH ESTATE AND EACH DEBTOR, INCLUDING ANY STATUTORY OR COMMON LAW RIGHT OF CONTRIBUTION WITH RESPECT TO ANY IMMATERIAL DEFECT, DEFICIENCY OR OTHER TITLE MATTER WITH RESPECT TO THE PURCHASED ASSETS (SUBJECT TO THE BUYER'S RIGHT TO RECEIVE TITLE TO THE PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ALL LIABILITIES UPON THE

19

TERMS AND SUBJECT TO THE CONDITIONS OF THIS AGREEMENT AND THE SALE ORDER.

Section 5.6    CONSPICUOUSNESS. EACH OF THE BUYER AND THE SELLER ACKNOWLEDGES THAT THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED IN THIS ARTICLE V AND ELSEWHERE IN THIS AGREEMENT ARE CONSPICUOUS.

ARTICLE VI.
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 6.1    Bankruptcy Court Actions. Each of the Buyer and the Seller will promptly take such actions as are reasonably requested by the other Party to assist in obtaining entry of the Sale Order by no later than the Sale Order Deadline. The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Seller of this Agreement and the other Related Agreements, (B) the sale of the Purchased Assets to the Buyer, and (C) the consummation of the Contemplated Transaction and the performance by the Seller of its obligations under this Agreement and the Related Agreements; (ii) authorize and empower the Seller to assume and assign to the Buyer the Assumed Contracts; and (iii) find that the Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, not a successor to the Seller, and that this Agreement and the Contemplated Transaction are undertaken by the Buyer and the Seller at arm's length, without collusion, that the Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code, and that the provisions of section 363(n) of the Bankruptcy Code are not applicable. The Buyer shall promptly take such actions as are reasonably requested by the Seller to assist in obtaining Bankruptcy Court approval of the Sale Order (with all aforementioned terms), including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that the Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code. In the event that the Sale Order is appealed or any Person seeks to stay the consummation of the Contemplated Transaction pending such an appeal, the Seller and the Buyer shall use reasonable efforts to defeat such motion for stay and defend such appeal, as applicable.

Section 6.2    Commercially Reasonable Efforts. The Buyer, on the one hand, and the Seller, on the other hand, will use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with each other in doing, all things necessary to consummate, in the most expeditious manner practicable, the transactions contemplated hereby, including the satisfaction of the conditions set forth in ARTICLE VIII.

Section 6.3    Filings with Governmental Entities; Permits and Licenses. Without limiting the generality or the effect of Section 6.2, the Buyer, on the one hand, and the Seller, on the other hand, will (i) cooperate with each other in connection with, and use their respective commercially reasonable efforts to provide information required for, any application or other filing to be made

20

with any Governmental Entity in connection with the transactions contemplated by this Agreement, and (ii) cooperate with each other in connection with, and use their respective commercially reasonable efforts to resolve, objections, if any, that are asserted by any Governmental Entity with respect to the transactions contemplated hereby.

ARTICLE VII.
OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing; *provided* that (i) the Seller shall not incur Liabilities associated with the obligations hereunder, but shall pay all related costs, including with respect to ordinary and necessary professional fees as are required for the Seller to comply with the obligations hereunder, and (ii) the Seller's obligations hereunder shall only continue until the Chapter 7 Cases are closed or dismissed.

Section 7.1    Cooperation. Each of the Parties shall cooperate with each other and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets from the Seller to the Buyer, including, without limitation, providing reasonable access and cooperation to any appraiser or other expert hired by either of the other Parties;

Section 7.2    Further Assurances; Turnover. In addition to any obligations of the Parties under Section 2.6(d), in case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request and as may be necessary to transfer, convey, and assign to the Buyer all of the Purchased Assets and to confirm the Seller's retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 7.2, to the extent that either the Buyer or the Seller discovers any additional assets or properties which the Parties mutually agree should have been transferred or assigned to the Buyer as Purchased Assets but were not so transferred or assigned, the Buyer and the Seller shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to the Buyer. If, after the Closing, the Seller receives any cash or other payments in respect of the Purchased Assets, the Seller shall, to the extent such cash or other payments are not Excluded Assets, pay any such amounts to the Buyer promptly after the receipt thereof and provide the Buyer with information as to the nature and source of any such amount. Without limiting the generality of this Section 7.2, to the extent that either the Buyer or the Seller discovers any additional assets or properties which the Parties mutually agree constitute Excluded Assets, the Buyer and the Seller shall cooperate and execute and deliver any instruments necessary to ensure the Estate's ownership and possession of such asset or property. If, after the Closing, the Buyer receives any cash or other payments in respect of the Excluded Assets, the Buyer shall pay any such amounts to the Seller promptly after the receipt thereof and provide the Seller with information as to the nature and source of any such amount.

Section 7.3    Harbinger Matter. From and after the Closing, Buyer agrees to provided commercially reasonably consultation and assistance to Seller and its counsel in the prosecution

21

of the Harbinger Matter at Buyer's expense. Any settlement of the Harbinger Matter shall require the mutual consent of Seller and Buyer.  As contemplated by Section 2.1(k), Seller shall pay to Buyer 10% of any Net Harbinger Recovery.

Section 7.4     Debtors' Customers Warranty Claims.  From and after the Effective Date, at the Buyer's election and discretion, Buyer shall be allowed to provide to the Debtors' customers services in the nature of warranty claims at Buyer's cost and expense; provided that the Seller shall license or otherwise provide access to Buyer, at no additional cost to Buyer, any Intellectual Property of the Debtors' necessary to provide such services and allow Buyer to purchase parts, at Debtors' cost as may be necessary to provide such services.  Buyer shall indemnify and hold Seller harmless from any and all claims or loss resulting from such actions by Buyer.

ARTICLE VIII.
CONDITIONS TO CLOSING

Section 8.1     Conditions to the Buyer's Obligations. Subject to Section 8.3, the Buyer's obligation to consummate the Contemplated Transaction in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Buyer in whole or in part to the extent permitted by applicable Law):

(a)     each of the representations and warranties of the Seller contained in this Agreement shall be true and correct in all respects as of the Closing, as if made at and as of the Closing (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(b)     the Seller shall have performed and complied with his covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and the Seller shall have caused the documents and instruments required by Section 2.8(a) to be delivered to the Buyer (or tendered subject only to Closing);

(c)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order or Law (whether temporary, preliminary or permanent) that is in effect and that has the effect of making the Closing illegal or that enjoins, restrains or otherwise prohibits the consummation of the Closing;

(d)     all consents and approvals of any Governmental Entity necessary to the consummation of the Contemplated Transaction shall have been obtained and shall be in full force and effect; provided that the failure to obtain a Governmental Approval with respect to the assignment or transfer of a Governmental Contract or Permit shall not be a condition to the Closing unless the failure to obtain such Governmental Approval results in a Material Adverse Effect;

(e)     the Sale Order shall have been entered by the Bankruptcy Court; and

(f)     the Seller shall have delivered a certificate dated as of the Closing Date signed by Seller or an authorized representative or agent thereof to the effect that each of

the conditions specified in <u>Section 8.1(a)</u>, <u>Section 8.1(b)</u>, and <u>Section 8.1(e)</u> have been satisfied; and

      (g)    No Material Adverse Event shall have occurred.

Section 8.2    <u>Conditions to the Seller's Obligations</u>. Subject to <u>Section 8.3</u>, the Seller's obligation to consummate the Contemplated Transaction in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Seller in whole or in part to the extent permitted by applicable Law):

      (a)    each of the representations and warranties of the Buyer contained in this Agreement shall be true and correct in all respects as of the Closing, as if made at and as of the Closing (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Buyer's ability to consummate the Contemplated Transaction;

      (b)    the Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and the Buyer shall have caused the documents, instruments and payments required by <u>Section 2.8(b)</u> to be delivered to the Seller (or tendered subject only to the Closing);

      (c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order or Law (whether temporary, preliminary or permanent) that is in effect and that has the effect of making the Closing illegal or that enjoins, restrains or otherwise prohibits the consummation of the Closing;

      (d)    all consents and approvals of any Governmental Entity necessary to the consummation of the Contemplated Transaction shall have been obtained and shall be in full force and effect; provided that the failure to obtain a Governmental Approval with respect to the assignment or transfer of a Governmental Contract or Permit shall not be a condition to the Closing unless the failure to obtain such Governmental Approval results in a Material Adverse Effect;

      (e)    the Sale Order shall have been entered by the Bankruptcy Court; and

      (f)    the Buyer shall have delivered a certificate dated as of the Closing Date signed by an officer of the Buyer or an authorized representative or agent thereof to the effect that each of the conditions specified in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u> have been satisfied.

Section 8.3    <u>No Frustration of Closing Conditions</u>. Neither the Buyer nor the Seller may rely on the failure of any condition to its obligation to consummate the Contemplated Transaction set forth in <u>Section 8.1</u> or <u>Section 8.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's (i) failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the

consummation of the Contemplated Transaction, or (ii) breach of a representation, warranty or covenant hereunder.

Section 8.4    <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VIII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

ARTICLE IX.
TERMINATION

Section 9.1    <u>Termination of Agreement</u>. This Agreement may be terminated and the Contemplated Transaction abandoned at any time prior to the Closing in accordance with this <u>Article IX</u>:

(a)    by the mutual written consent of the Buyer, on the one hand, and the Seller, on the other hand;

(b)    by written notice of either the Buyer or the Seller, if there shall be any Law that makes consummation of the Contemplated Transaction illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Order restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transaction or declaring unlawful the Contemplated Transaction (other than, for the avoidance of doubt, with respect to any Governmental Contract or Permit for which approval or consent is required in order to transfer to Buyer and which approval or consent has not yet been obtained); *provided* that no termination may be made by a Party under this <u>Section 9.1(b)</u> if the issuance of such Order was caused by the material breach of such Party;

(c)    by written notice of either the Buyer or the Seller, if the Closing shall not have occurred on or before the Outside Date; *provided*, further, that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 9.1(c)</u> if the failure of the Closing to have occurred by the Outside Date (as extended) was caused by a material breach of this Agreement by such Party;

(d)    by written notice of the Buyer to the Seller if any of the Chapter 7 Cases are dismissed or closed or if the Seller ceases to be the Chapter 7 Trustee in any of the Chapter 7 Cases, or if any Chapter 7 Case is converted to one under Chapter 11 of the Bankruptcy Code for any reason prior to Closing;

(e)    by the Buyer, if (i) the Sale Order shall not have been entered by the Bankruptcy Court on or before the Sale Order Deadline or (ii) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated, or otherwise modified in form and substance no longer satisfactory to the Buyer;

(f)    by the Buyer by giving written notice to the Seller at any time prior to Closing (i) in the event the Seller has breached any representation, warranty, covenant, or agreement contained in this Agreement and as a result of such breach the conditions set forth in <u>Section 8.1</u> hereof, as the case may be, would not then be satisfied at the time of

24

such breach, the Buyer has notified the Seller of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other material conditions of the Buyer to be satisfied prior to such date have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of the Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by the Buyer;

(g)    by the Seller by giving written notice to the Buyer at any time prior to Closing (i) in the event the Buyer has breached any representation, warranty, covenant, or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 8.2 hereof, as the case may be, would not then be satisfied at the time of such breach, the Seller has notified the Buyer of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other material conditions of the Seller to be satisfied prior to such date have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of the Seller to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by the Seller; and

(h)    by the Seller if there is an alternative transaction and the Seller has determined in good faith after consultation with the Seller's legal counsel that failure to consummate the alternative transaction would reasonably be expected to violate the Seller's duties under the Bankruptcy Code; provided that, in connection with any termination pursuant to this Section 9.1(h), Seller shall reimburse Buyer, as an administrative priority, the amount of any Asset Removal Costs that Buyer has incurred with the Seller's prior written consent.

Notwithstanding anything to the contrary contained herein, (i) in no event may the Buyer terminate this Agreement on account of the Buyer's failure to satisfy the conditions contained in section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract, and (ii) a Party shall not be permitted to terminate this Agreement pursuant to this Article IX if the applicable termination was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

Section 9.2    Procedure upon Termination. In the event of termination and abandonment by the Buyer, on the one hand, or the Seller, on the other hand, or both, pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Party, and this Agreement shall terminate (subject to the conditions of this Section 9.2 and Section 9.3) and the Contemplated Transaction shall be abandoned, without further action by the Buyer or the Seller.

Section 9.3    Effect of Termination. In the event that this Agreement is validly terminated pursuant to a right of termination as provided in Section 9.1, then all rights of the Parties hereunder shall terminate and each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Buyer or the Seller (or any other Person) and termination shall be the sole and exclusive remedy of the Parties for a breach of this Agreement; *provided, however,*

25

notwithstanding the foregoing, that Sections 9.1, Section 9.2, this Section 9.3, and Article X shall survive any such termination and shall be enforceable hereunder and in no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

ARTICLE X.
MISCELLANEOUS

Section 10.1    Limitation of Liability. In no event shall either Party be liable to the other Party for punitive, exemplary or special damages.

Section 10.2    Expenses. Notwithstanding anything contained herein, each Party shall bear its own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transaction.

Section 10.3    Entire Agreement. This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein) and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements, or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

Section 10.4    Incorporation of Schedules, Exhibits, and Schedules. The schedules, appendices and exhibits to this Agreement are incorporated herein by reference and made a part hereof.

Section 10.5    Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 10.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 10.6    Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of all Parties; *provided, however*, that the Buyer shall be

26

permitted to assign any of its rights hereunder to (i) its lenders as collateral security for Buyer's obligations under any of its secured debt financing arrangements, or (ii) one or more of its Affiliates, as designated by the Buyer in writing to the Seller; *provided, however*, the Buyer shall remain liable for all of its obligations under this Agreement after any such assignment.

Section 10.7    Notices. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to the Seller, then to:

> Jeoffrey L. Burtch, Trustee
> P.O. Box 549
> Wilmington, DE 19899

> With copies (which shall not constitute notice) to:

> Mark E. Felger
> Cozen O'Connor
> 1201 North Market Street, Suite 1001
> Wilmington, DE 19801

If to the Buyer, then to:

> WHS Energy Solutions, Inc
> c/o AFV Management Advisors, LLC
> 2126 Hamilton Road, Suite 260
> Argyle, TX 76226

> With copies (which shall not constitute notice) to:

> Greg Milmoe
> Greenberg Traurig, LLP
> One International Place, Suite 2000
> Boston, MA 02110

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 10.7.

Section 10.8    Governing Law; Jurisdiction. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without

27

giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, and the federal courts of the United States of America sitting in the District of Delaware, shall have exclusive jurisdiction over such Litigation.

Section 10.9    Consent to Service of Process. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.7.

Section 10.10 WAIVERS OF JURY TRIAL. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

Section 10.11 Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall amend this Agreement with a suitable and equitable provision that shall be substituted therefor in order to carry out to the closest extent possible, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 10.12 No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

Section 10.13 No Survival of Representations, Warranties, and Agreements. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance to be completed by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or

28

agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing (it being agreed that all such rights, remedies, recourse and entitlements are hereby expressly waived and released to the fullest extent permitted by Law effective immediately as of the Closing) in the absence of willful misconduct, intentional misconduct or fraud. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for one (1) year following the Closing Date, and nothing in this Section 10.13 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. The Buyer and the Seller acknowledge and agree that the agreements contained in this Section 10.13: (a) require performance after the Closing to the maximum extent permitted by applicable Law; and (b) are an integral part of the Contemplated Transaction and that, without the agreements set forth in this Section 10.13, none of the Parties would enter into this Agreement.

Section 10.14  Non-Recourse. This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent, advisor or representative of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the Parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement.

Section 10.15  Construction. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other subdivision of this Agreement. The word "or" shall not be exclusive. Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices, and the Schedules herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Schedules of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified, or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

Section 10.16  Computation of Time. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to the Seller or the Chapter 7 Case, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

Section 10.17  Mutual Drafting. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no

presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 10.18  Headings; Table of Contents. The section headings and the table of contents contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 10.19  Counterparts; Facsimile and Email Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**[SIGNATURE PAGES FOLLOW]**

30

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

SELLER:

By: _____

Name: Jeoffrey L. Burtch

Title:   Chapter 7 Trustee for the Bankruptcy Estates of Canoo Inc., EV Global Holdco LLC, EV US Holdco LLC, Canoo Manufacturing, LLC, Canoo Sales, LLC and Canoo Technologies Inc.

ACTIVE 707194305v6

BUYER:

**WHS ENERGY SOLUTIONS, INC.**

By: _____
Name: Anthony Aquila
Title: CEO

Exhibit A

Bill of Sale

*Form of Bill of Sale*

## <u>BILL OF SALE</u>

This Bill of Sale is effective as of [_____] [__], 2025, by and among Jeoffrey L. Burtch, not individually, but solely as the Chapter 7 Trustee for the bankruptcy Estates of the Debtors ("<u>Seller</u>"), and WHS Energy Solutions, Inc., a Delaware corporation ("<u>Buyer</u>"). All capitalized terms used in this Bill of Sale and not otherwise defined herein shall have the respective meanings ascribed to such terms in that certain Asset Purchase Agreement, dated as of March [__], 2025, by and among Seller and Buyer (the "<u>Purchase Agreement</u>").

WHEREAS, Seller and Buyer are parties to the Purchase Agreement, under which Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets in accordance with <u>Section 2.1</u> of the Purchase Agreement and the Sale Order, excluding the Excluded Assets defined in <u>Section 2.2</u> of the Purchase Agreement.

WHEREAS, Buyer desires to purchase, acquire and receive from Seller the Purchased Assets.

NOW, THEREFORE, in consideration of the foregoing, the consideration set forth in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

Seller hereby SELLS, ASSIGNS, CONVEYS, AND TRANSFERS unto Buyer and each of its respective successors and assigns, as applicable, all of the right, title and interest of the Seller and the Estates in and to the Purchased Assets pursuant and subject to the terms and conditions of the Purchase Agreement and Sale Order, including, where applicable, on an <u>AS IS-WHERE-IS</u> basis, TO HAVE AND TO HOLD unto Buyer and each of its successors and assigns, as applicable, together with, all and singular, the rights and appurtenances thereto in any way belonging to Seller or the Estates. Notwithstanding anything in this Bill of Sale to the contrary, Seller and Buyer hereby expressly acknowledge and agree that Seller shall retain the Excluded Assets and Excluded Liabilities.

Buyer hereby assumes any and all applicable duties, obligations and liabilities with respect to the Purchased Assets to the extent provided in the Purchase Agreement.

The sale and conveyance made hereby shall be effective as of the Closing and risk of loss of the Purchased Assets shall pass to Buyer upon execution of this Bill of Sale.

The terms of the Purchase Agreement, including but not limited to, the representations, warranties, covenants, agreements and indemnities of any party are incorporated herein by reference. The Seller and the Buyer acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded or deemed enlarged, modified or altered in any way hereby, but shall remain in full force and effect to the full extent provided in the Purchase Agreement. In the event that any provision of this Bill of Sale or the Purchase Agreement may be construed to conflict or be inconsistent with a provision or term of the Sale Order, the provision or term in the Sale Order shall control.

This Bill of Sale shall be governed by and interpreted in accordance with the laws of the State of Delaware, without regard to the conflict of laws principles thereof.

This Bill of Sale may be executed in counterparts, and when so executed, each counterpart shall be deemed an original, and said counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, Seller and Buyer have executed this Bill of Sale as follows, effective as of the date first above written.

**[SIGNATURE PAGES TO FOLLOW]**

*Form of Bill of Sale*

**SELLER**:

By: _____

Name: Jeoffrey L. Burtch

Title:  Chapter 7 Trustee for the Bankruptcy
        Estates of Canoo Inc., EV Global Holdco
        LLC, EV US Holdco LLC, Canoo
        Manufacturing, LLC, Canoo Sales, LLC
        and Canoo Technologies Inc.

**BUYER**:

**WHS ENERGY SOLUTIONS, INC.**

By: _____

Name: _____

Title: _____

Schedule 2.3(c)

Estimated Removal Costs

**Asset Removal Costs / Budget**
**Jan 17th - April 30th (3.5 months)**

| Category | Description | Actuals / Estimates | Amount Total | Estimated Cure Costs |
|---|---|---|---|---|
| Rent + CAM | Pryor (MAIP) | Actuals | $ 229,513 | |
| Electricity - OKC | OG&E | Estimates | $ 76,000 | |
| Electricity -Pryor | Grand River Dam Authority (Pryor) | Actuals | $ 102,253 | $ 58,000 |
| IT | Crayon - Office 365, Sharepoint etc. | Actuals | $ 75,404 | |
| IT | Oracle - For granularity in data | Actuals | $ 324,760 | $ 122,000 |
| Security | Security Guards | Estimates | $ 62,093 | |
| Patent | Recurring License Fees | Actuals | $ 155,000 | |
| IT - Vehicle Software | Contegix, Electrobit, Trash CAN, Altair, Stratus-X | Actuals | $ 306,000 | |
| Hazmat - SGL - CA & TX to OKC | Move costs - from SGL CA & TX to OKC | Estimates | $ 170,000 | |
| Move from Lyseon to OKC | Move costs - from Lyseon to OKC | Estimates | $ 20,960 | |
| Move from Pryor to OKC | Move costs - from Pryor to OKC | Estimates | $ 793,000 | |
| Commissioning of Battery Line in OKC | Cost of commissioning the line at OKC | Estimates | $ 1,100,000 | |
| | | | $ 2,314,982 | |

Schedule 2.6(a)

Assumed Contracts and Cure Costs

**WHS Energy Solutions**

**Assumed Contracts**

As of March 3, 2025

**Other Contracts Assumed**

| Supplier Name | Cure Costs as of 4/15/2025 |
|---|---|
| I-40 OKC Partners LLC | $ 3,739,005 |
| 15306 HWY 114 LLC | $ 110,318 |
| 15520 HWY 114 LLC | $ 586,978 |
| Grand River Dam Authority | $ 160,761 |
| OG&E | $ 92,032 |
| Electrical Solutions of Oklahoma | $ 70,008 |
| | $ 4,759,102 |

Schedule 2.6(e)

Provisionally Designated Contracts

# WHS Energy Solutions

## Provisionally Designated Contracts

As of March 3, 2025

### Business Unit A

| Supplier Name | Cure Costs as of 1/17/2025 | |
|---|---|---|
| Kyungshin Cable International Corporation | $ | 234,926 |
| ContiTech MGW GmbH | $ | 60,944 |
| FWU JIH DIE CASTING INDUSTRIAL CO LTD | $ | 80,650 |
| Interplex Suzhou Precision Engineering LTD | $ | (1,744) |
| Oetiker NY Inc | $ | 22,289 |
| Rogers Luxembourg | $ | 750 |
| Sensata Technologies Inc | $ | 2,161 |
| | $ | 399,976 |

### Business Unit B

| Supplier Name | Cure Costs as of 1/17/2025 | |
|---|---|---|
| Automatic Spring Products Corporation | $ | 6 |
| BlueTech Global LLC | $ | 29,209 |
| Devries International Inc | $ | - |
| DN Automotive USA Inc | $ | 86,043 |
| Donaldson Company Inc | $ | 4,128 |
| Dura Ganxiang Automotive Systems Shanghai Co Ltd | $ | 1,618 |
| EPCO Products Inc | $ | - |
| Filtran LLC | $ | 144,249 |
| Freudenberg NOK Sealing Technologies | $ | 4,100 |
| GGB LLC | $ | - |
| Jing-Jin Electric North America LLC | $ | 569,325 |
| MDA US LLC | $ | 229,745 |
| NMB Technologies Corporation | $ | 46,880 |
| POSCO INTERNATIONAL AMERICA CORP | $ | 24,025 |
| Principal Manufacturing Corporation | $ | 86,515 |
| Schaeffler Group USA Inc | $ | 4,146 |
| SHW Automotive Pumps (Kunshan) Co Ltd | $ | (170) |
| | $ | 1,229,819 |