**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CANOO, INC., *et al.*[1]<br>　　　　　　　　Debtors. | Chapter 7<br><br>Case No. 25-10094 (BLS)<br><br>(Joint Administration)<br><br>**Re: D.I. 141** |

**MOTION OF CHARLES GARSON FOR RELIEF FROM ORDER**
**(A) APPROVING ASSET PURCHASE AGREEMENT AND SALE OF THE DEBTORS'**
**ASSETS PURSUANT TO 11 U.S.C. § 363, AND (B) GRANTING RELATED RELIEF**

Charles Garson ("Garson" or "Movant"),[2] by and through undersigned counsel, hereby moves (this "Motion") the Court, pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), made applicable by Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), respectively, for relief from the *Order (A) Approving Asset Purchase Agreement and Sale of the Debtors' Assets Pursuant to 11 U.S.C. § 363 and (B) Granting Related Relief* [D.I. 141] (the "Sale Order") entered on April 9, 2015 approving the sale of substantially all assets of the above-captioned Debtors (collectively, the "Debtors") to WHS Energy Solutions, LLC ("WHS"), an entity owned and controlled by the Debtors' former CEO. In support of this Motion, Movant relief on the *Declaration of Charles Garson* (the "Garson Declaration") and the exhibits annexed thereto, and respectfully states as follows:

---

[1] The Debtors in these cases are the following entities (the respective case numbers for each estate follows in parentheses): Canoo, Inc. (25-10094 BLS); EV Global Holdco LLC (25-10095 BLS); EV US Holdco Inc., (25-10096 BLS); Canoo Technologies Inc. (25-10099 BLS); Canoo Manufacturing LLC (25-10097 BLS); and Canoo Sales, LLC (25-10098 BLS).

[2] Capitalized terms not defined in this Motion shall have the meanings ascribed to them in the the Sale Order, Sale Motion, APA, the Trustee's declaration in support of the Sale Motion (the "Sale Declaration"), or Garson Declaration, as the context requires.

**PRELIMINARY STATEMENT**

1. By this Motion, Movant asks the Court to remedy a flawed sale process that resulted in the approval of a transaction involving an insider buyer and the failure to meaningfully consider a superior offer from Movant, ultimately resulting in substantial harm to the Debtors' estate and its creditors.

2. Movant, who offered to pay $20 million for the Purchased Assets, believed he had more than enough time to submit his superior bid based on communications with the Trustee and his counsel. In reliance on such communications, Movant did not object to the sale or formally submit a competing bid, all while continuing to finalize his offer and requesting clarifications from the Trustee regarding critical questions (which went unanswered). Despite a clearly superior offer being practically thrown at him, the Trustee determined to seek Court approval of a transaction (the "Sale") with WHS, an entity owned and controlled by the Debtors' former Chief Executive Office, Anthony Aquila ("Aquila"), and thereafter rapidly proceeded to closing.

3. Relief is warranted under Rule 60(b) or, alternatively, Rule 59(e), to protect the integrity of the bankruptcy process and the interests of creditors for multiple reasons. *First*, the Court was not provided an opportunity to scrutinize the $11 million credit bid portion of the Sale consideration (the "Credit Bid"), which was assigned to WHS from another one of Mr. Aquila's companies, AFV Management Advisors, LLC ("AFV").[3] A substantial portion of the Credit Bid—approximately $3.845 million—is subject to avoidance by the Debtors' estates because these funds were used, during the 90 days prior to the Petition Date, to convert AFV's unsecured debt that existed at the time into secured debt that formed part of the Credit Bid. The conversion of AFV's

---

[3] As an affiliate of Mr. Aquila (Debtors' former CEO), AFV, like Mr. Aquila, is an insider of the Debtors. *See* 11 U.S.C. §§ 101(2), 101(31).

pre-existing unsecured debt into secured debt during the preference period constitutes an avoidable preference, especially given the fact that AFV is an insider of the Debtors. Thus, the total consideration under the Sale was not $17 million as suggested, but closer to $13.155 million. But none of this was presented in the Sale Motion, Sale Declaration, or on the record at the Sale Hearing.

4. *Second*, given the nature of the Sale as an insider transaction, heightened scrutiny was warranted, especially in light of the pattern of prepetition conduct by Aquila and his related entities that at least creates the appearance of impropriety. This was not possible because none of the relevant information was made available to the Court and, under the circumstances, the Court's good faith fundings under Bankruptcy Code section 363(m) must be revisited. Such information is set forth in full herein and in the accompanying declaration for the Court's consideration.

5. *Third*, Movant made numerous overtures to the Trustee leading up to the Sale Hearing that fell on deaf ears. Movant was not aware of the proposed sale of the Debtors' assets to an entity owned and controlled by Mr. Aquila until after the March 28, 2025, deadline to object to the proposed sale. After initial contact with the Trustee on April 3, 2025, Movant made a clear offer for the Purchased Assets worth approximately $20 million, agreed to make a non-refundable $1 million to cover the estate's carrying costs during a requested diligence period, and offered to pay all insurance costs and costs related to removal of the Purchased Assets from their present locations. Movant proceeded with finalizing his offer in reliance on representations from the Trustee and his counsel that his offer would be considered if he could provide financial assurances and close the transaction in April 2025. Movant even offered to transfer the entire cash component of his offer to the Trustee to hold in escrow pending ongoing diligence. And, as late as

April 7, 2025, movant was told that the Sale to WHS would be closing in 2 weeks (*i.e*., April 21, 2025).

6.      In sum, Movant presented a far superior offer (including millions more in cash for the Debtors' estate and creditors) and proceeded with finalizing details under the impression that, so long as he could provide financial assurances and close by the end of April, the Trustee would consider his offer.  Instead, the Trustee moved forward with the Sale Hearing, obtained the Sale Order, and closed the Sale with WHS 2 days later (*i.e*., April 11, 2024).

7.      For the forgoing reasons, the Court should vacate the Sale Order, direct the Trustee to reopen the sale process and consider Movant's superior offer for the Purchased Assets (and any other offers that may be presented), and grant such other relief as is appropriate under these circumstances.  Movant is mindful that the relief he seeks is not something the Court would do lightly under ordinary circumstances.  But the compelling and unusual circumstances presented here justify granting the requested relief.

## **JURISDICTION**

8.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  The Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Pursuant to Local Rule 9013-1(f), Movant consents to entry of a final order with respect to the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue with respect to the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The bases for the relief requested in the Motion are Bankruptcy Code §§ 105(a) and 363, Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

10. On January 17, 2025 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 7 of title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"), thereby commencing these chapter 7 cases (the "Cases").

11. The Debtors were an electric vehicle company focused on the development and manufacture of electric vehicles, such as vans, pickup trucks, sedans and light duty commercial vehicles. The Debtors ceased operations upon the commencement of their chapter 7 cases and the chapter 7 trustee is currently liquidating the Debtors' assets.

12. Valued at approximately $2.4 billion as recently as 2020, the Debtors experienced a dramatic collapse under Aquila's leadership. Between 2022 and mid-2024, the company burned through approximately $1 billion in capital, posting net losses of $488 million in 2022, $303 million in 2023, and $118 million in just the first half of 2024. Amid mounting financial troubles and a near-total loss in market value, Aquila appears to have orchestrated a series of insider arrangements that positioned him to acquire the company's remaining assets through an insider-controlled entity in bankruptcy.

**A.    The Credit Bid Component of the Aquila Offer is Subject to a Bona Fide Challenge**

13. In the months leading to bankruptcy, the Debtors executed a series of financial transactions that demonstrate clear insider manipulation to position Aquila for a favorable asset acquisition through the bankruptcy process.

14. In October and November 2024, Debtors issued *unsecured* promissory notes to AFV (the "AFV Unsecured Notes") in the aggregate amount of $3.845 million.

15. Less than a month later, Canoo Inc., as borrower, and AFV, as lender, entered that certain *Revolving Credit Agreement* dated November 5, 2024 (as amended, supplemented, or otherwise modified, the "Prepetition AFV Credit Agreement"). The Prepetition AFV Credit Agreement contemplated up to $12.0 million in revolving advances, of which the "Initial Advance" of $3.845 million was specifically dedicated to repayment of the AFV Unsecured Note. In other words, just weeks before the Petition Date, Debtors replaced their *unsecured* obligations under the AFV Unsecured Note with *secured* obligations under the Prepetition AFV Credit Agreement. This maneuver converted *unsecured insider* debt into *secured insider* debt, which (after AFV assigned its claim to WHS) formed the basis for WHS's $11 million Credit Bid.[4]

16. Canoo Inc., as grantor, and AFV, as lender, entered into a *Security Agreement*, dated as of November 5, 2024, pursuant to which Canoo Inc. granted a lien and security interest to AFV in certain listed equipment (the "Initial Equipment Collateral") to secure the Prepetition AFV Secured Obligations.

17. Canoo Technologies Inc., as grantor, and AFV, as lender, entered into a separate *Security Agreement*, also dated as of November 5, 2024, pursuant to which Canoo Technologies Inc. granted a lien and security interest to AFV in the Initial Equipment Collateral to secure the Prepetition AFV Secured Obligations. AFV filed UCC-1 financing statements against both Debtors covering the Initial Equipment Collateral.

18. From and after execution of the Prepetition AFV Credit Agreement on November 5, 2024, AFV made the "Initial Advance" of $3.845 million under the Prepetition AFV Credit

---

[4] According to the applicable Debtors' bankruptcy schedules, as of the Petition Date, Canoo Inc. and Canoo Technologies Inc. were indebted and liable to AFV under the Prepetition AFV Credit Agreement in the aggregate principal amount of $10.66 million, plus accrued interest of $191,395, plus all other fees, costs, expenses, charges, and any other "Obligations" (as defined in the Prepetition AFV Credit Agreement) (collectively, the "Prepetition AFV Secured Obligations").

Agreement, which was applied against pre-existing AVF Unsecured Notes. AFV subsequently advanced additional funds to the applicable Debtors through mid-December 2024.

19. On December 17, 2024, AFV made one final advance of $2.5 million to the applicable Debtors. In consideration of such additional advance, each of Canoo Inc., and Canoo Technologies Inc. entered into a separate *Amendment to Security Agreement*, dated as of December 17, 2024, pursuant to which Canoo Inc, and Canoo Technologies Inc. granted liens and security interests in favor of AFV in certain additional listed equipment (the "Additional Equipment Collateral") to further secure the Prepetition AFV Secured Obligations. On December 19, 2024, AFV filed a UCC-3 amended financing statement against Canoo Technologies Inc. with the state of Delaware, which covered the Additional Equipment Collateral and attached a list thereof. No such filing was made against Canoo Inc.

20. The conversion of unsecured notes totaling $3.845 million in principal obligations owed to AFV into secured obligations under the Prepetition AFV Credit Agreement within 90 days of the Petition Date constitutes an avoidable preference under 11 U.S.C. § 547. ***Nowhere*** in the Sale Motion, Sale Declaration, or the record of the Sale Hearing is any of the foregoing information mentioned.

**B.    Other Events Pointing to Purchaser's Lack of Good Faith**

21. The aforementioned related-party transactions occurred during a period of rapid leadership turnover and financial distress. Taken together, the prepetition events underscore the troubling insider dynamics and lack of transparency surrounding the sale, reinforcing the need for judicial scrutiny and reconsideration of the Sale Order.

22. Just days after execution of the Prepetition AFV Credit Agreement, Debtors' Chief Financial Officer and General Counsel resigned. Simultaneously, Debtors announced a 23% reduction in its Oklahoma City factory workforce as part of a purported realignment effort.

23. In the months leading up to these events, Debtors relocated their headquarters from Torrance, California, to a facility in Justin, Texas—owned by an Aquila-controlled (and therefor an affiliate insider) private equity firm, AFV Partners. Aquila also caused the Debtors to execute lease agreements for the Texas facility and an Oklahoma City facility, with combined monthly lease payments of approximately $400,000—funneling additional cash into AFV Partners while the company struggled to remain solvent. Debtors were then caused to invest in significant improvements to AFV Partners' facilities.

24. Moreover, by the Petition Date, Aquila already had effective possession of nearly all the Debtors' physical infrastructure and assets. Most of the Debtors' physical assets (purchased for a combined $364 million) were bought for and located at the Debtors' original Torrance, California headquarters. In September 2024, Aquila orchestrated the relocation of Debtors' substantial assets to AFV Partners' facilities in Justin, Texas. It comes as no surprise then that Aquila was ready on day one of these Cases to negotiate the purchase of the Debtors' assets. *See* Sale Hearing Tr. at 46:14-16 ("All I know is the negotiations with the buyer took place over at least 30 days, starting from the day of the bankruptcy filing in January.").

25. Debtors' operational projections under Aquila were similarly misleading. The company publicly announced production targets of 3,000 to 6,000 vehicles in 2022 and 14,000 to 17,000 vehicles in 2023 and 40,000 to 50,000 in 2024. In reality, these claims of production were materially misleading, grossly inaccurate and totally bogus: Debtors produced zero vehicles in 2022, just twenty two (22) in 2023, and remained far below even minimal production thresholds

into 2024 with barely 12 vehicles. These inflated forecasts were used to raise capital, sustain share price and project viability while the company continued to hemorrhage cash.

26. Public disclosures further paint a troubling picture of Aquila's leadership. In SEC filings and investor communications, Aquila claimed to be the "inventor of over 100 patents"—a claim made under penalty of law and presented as central to his leadership qualifications. Yet public records from the U.S. Patent and Trademark Office from the same time identified approximately ten patents listing Aquila as just one of several inventors listed on filed patents. More recent descriptions on AFV's own website quietly walked back the assertion, where Aquila is described as only being "associated with" 100+ patents.

27. Despite all these red flags and WHS's obvious insider status, the Trustee accepted the WHS offer without conducting *any* marketing process (other than by indicating in the Sale Motion that the objection deadline was also the deadline to submit higher and better offers). No investment banker was retained, and no formal auction occurred. When competing interests emerged—including a substantially higher offer by the Movant—the Trustee closed the sale within 2 days of entry of the Sale Order. The cards were clearly stacked against any other potentially interested purchaser from the inception of these Cases when the Trustee began negotiating with Aquila.

C. **The Trustee Ignores Movant's Superior Offer**

28. Starting on April 3, 2025, Movant made multiple attempts at outreach to the Trustee and his counsel to facilitate his superior $20 million offer[5] for the Purchased Assets. Among other things, Movant made clear that he was capable of meeting the Trustee's requirement that he

---

[5] In addition to the $9 million cash component ($5 million more than paid by WHS), Movant's offer would add at *least* $500,000 in value by leaving the Aquila-related preference claims in the estates. In any event, the value of the consideration provided by WHS must be reduced by the $3.85 million reduction in the Credit Bid described above.

provide financial assurances for a $20 million bid, close by the end of April 2025, and provide a non-refundable $1 million deposit to cover the estate's carrying costs during the requested diligence period.

29. Movant was granted access to the Trustee's database on April 7, 2025. Review of the documents therein raised serious concerns about the accuracy of the Debtors' asset schedules and the propriety of the estate's $500,000 monthly carrying costs (much of which appeared to be paid to Aquila-affiliated entities like AFV Partners).

30. At all times, Movant's impression based on his communications with the Trustee and his counsel was that he had ample time to submit a competing offer as long as it closed by the end of April 2025—even if the Sale Hearing had occurred. It was not until after the Sale Hearing (and entry of the Sale Order) that Movant was told he was out of time.

## RELIEF REQUESTE

31. By this Motion, Movant respectfully requests that the Court (i) set aside the Sale Order, (ii) direct the Trustee to reopened the sale process to permit Movant (and any other potential bidders) to present their qualified superior offers, and (iii) grant any further relief that is just and proper to preserve the integrity of the bankruptcy sale process.

## BASIS FOR REQUESTED RELIEF

32. Pursuant to Fed. R. Civ. P. 59 and 60, made applicable by Fed. R. Bankr. P. 9023 and 9024, a party may obtain relief from a final order.[6] A judgment may be altered or amended if the party seeking reconsideration demonstrates one of the following grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error

---

[6] Under Fed. R. Bankr. P. 9023, a motion to alter or amend a judgment shall be filed no later than fourteen days after entry of the judgment. The Court entered the Sale Order on April 9, 2025. Accordingly, Movant has timely moved for relief under Fed. R. Bankr. P. 9023.

of law or prevent manifest injustice." *See*, *e.g.*, *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010); *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

33. Federal Rule of Civil Procedure 60(b), incorporated by Federal Rule of Bankruptcy Procedure 9024, similarly provides that, upon a motion and just terms, "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for," among other reasons, "mistake, inadvertence, surprise, or excusable neglect," or "any other reason that justifies relief." Fed. R. Civ. P. 60(b). Rule 60 should be liberally construed so that judgments will reflect the true merits of a case. 11 FED. PRAC & PROC CIV. § 2853.

34. Among other things, Federal Rule 59 and 60 authorize bankruptcy courts to set aside sales transactions confirmed pursuant to 11 U.S.C. § 363. *See In re: Met-L-Wood*, 861 F.2d 1012, 1018 (7th Cir. 1988) ("confirmed sales-which are final judicial orders-can be set aside . . . under Rule 60(b)"). Although the policy of finality normally protects confirmed sales from orders to set aside, sales are properly set aside when compelling equities outweigh the "interests in finality." *Matter of CADA Investments, Inc.*, 664 F.2d 1158 (9th Cir. 1981). This is because the policy of finality is not absolute: "Courts have generally appeared willing to set aside confirmed sales that were tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction." *Id*. at 1162 (citation and internal quotation marks omitted); *see also Matter of Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985) (existence of fraud, mistake, or a like infirmity generally necessary to set aside a confirmed sale). These rules are intended to guarantee stability in such sales and thereby encourage high bids.

35. However, it "is well settled that a bankruptcy court can vacate a sale order as improvident upon appropriate facts and countervailing equities, even though there was no direct

appeal from the sale order." *In re Silver Bros. Co., Inc.*, 179 B.R. 986, 1007 (Bankr. D.N.H. 1995). Even where no default has occurred by a successful bidder in a bankruptcy sale, the bankruptcy court, as a court of equity, nevertheless may vacate such sale orders when it appears that a particular order "was entered through mistake, inadvertence or improvidence." *Mason v. Ashback et al.*, 383 F.2d 779, 780 (10th Cir.1967). The point is that judicial sales, unlike ordinary private commercial transactions, involve parties other than the particular parties to the sale transaction. Thus, sales should be set aside when "compelling equities" outweigh the interest in finality. *See In re Times Sales Fin.*, 445 F.2d 385 (3d Cir. 1971); *Jackson v. Pacific Energy Resources*, 683 F.2d 326, 328 (9th Cir. 1982).

36. It is essential that every important determination in bankruptcy proceedings receive the "informed, independent judgment" of the bankruptcy court. *In re Fort Wayne Telsat, Inc.*, 489 B.R. 773, 777 (Bankr. N.D. Ind. 2010), *aff'd*, 665 F.3d 816 (7th Cir. 2011). While the most frequent mistake or infirmity held to warrant vacating a confirmed sale is defective notice to interested parties, other objections deemed sufficient to defeat confirmation, involve further irregularities in the judicial sale proceedings themselves such as "unfairness toward bidders, stifling of competition, inaccurate or otherwise insufficient advertisement, sham bidding or 'puffing,' and interference with the orderly conduct of the sale." 4B COLLIER ON BANKRUPTCY, ¶ 70.98[17]. For example, in *In re Time Sales Finance Corp.*, 445 F.2d 385 (3d Cir. 1971), *cert. denied sub nom. Gross v. Welsh*, 405 U.S. 917 (1972), the Third Circuit upheld an order setting aside a sale and suggested that the "major question" in examining the propriety of orders to set aside is "one of common decency." 445 F.2d at 387; *see also In re Lamont*, 453 F.Supp. 608 (N.D.N.Y.1978), *aff'd mem.*, 603 F.2d 213 (2d Cir. 1979); *In re Lintz West Side Lumber, Inc.*, 655 F.2d 786 (7th Cir. 1981) (affirming order to set aside abandonment of estate property to

secured creditors on basis of evidence, discovered after abandonment, that secured interests were improperly perfected).

37. Movant submits that ample cause exists to grant the requested relief from the Sale Order and reopen the sale process. The facts at issue here are troubling and reveal a pattern of insider control and a rushed sale process that denied the estate the benefit of fair market competition. As noted above, the conversion of unsecured notes totaling $3.845 million in principal obligations owed to AFV into secured obligations under the Prepetition AFV Credit Agreement constitutes an avoidable preference, making the Credit Bid considered by the Court overinflated by that amount.

38. Moreover, the events in the months leading up to the Petition Date (including actions taken by the Debtors while Aquila was CEO) raise the appearance of impropriety that warrants further scrutiny by the Court. That the Trustee began negotiations with Aquila on day 1 of the Cases and that the marketing and sale process essentially comprised the Sale Motion and indication in the notice thereof that the related objection deadline was also the deadline to submit higher or better offers also suggests that the Court review the circumstances surrounding the Sale with fresh eyes.

39. Further, pursuant to Bankruptcy Rule 9023, a decision should be reconsidered "where it appears [the Court] has overlooked or misapprehended some factual matter that might reasonably have altered the result reached by the Court." *See, e.g.*, *In re Tribune Co.*, 464 B.R. 208, 215 (Bankr. D. Del. 2011) ("[R]econsideration is appropriate when the Court has overlooked facts that might reasonably have altered or impacted the decision."). Here, the Court should reconsider the Sale Order because it the Court was not provided with all of the relevant facts necessary to

properly conclude that the insider Sale was appropriate and that WHS was entitled to the protections of section 363(m).

40.     Taken together, the facts presented herein (which were not available to the Court during the Sale Hearing) warrant reconsideration or *vacatur* of the Sale Order and the protections granted under section 363(m) of the Bankruptcy Code.

## **CONCLUSION**

For the foregoing reasons, Movant respectfully requests that the Court (i) grant the relief requested herein, (ii) vacate the Sale Order and direct the Trustee to reopen the sale process, and (iii) grant such other and further relief as the Court deems just and proper.

Dated: April 23, 2025     Respectfully submitted,
Wilmington, Delaware

**REED SMITH LLP**

By:  */s/ Jason D. Angelo*
Jason D. Angelo (No. 6009)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
E-mail: jangelo@reedsmith.com

*Counsel to Charles Garson*