UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Chapter 11 |
| | . Case No. 25-10094 (BLS) |
| CANOO INC., *et al.*, | . |
| | . (Jointly Administered) |
| | . |
| | . Courtroom No. 1 |
| | . 824 North King Street |
| | . Wilmington, Delaware 19801 |
| Debtors. | . |
| | . Wednesday, April 9, 2025 |
| . . . . . . . . . . . . . . . . | . 11:30 a.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Chapter 7 Trustee, Jeoffrey Burtch: | Mark Felger, Esquire<br>COZEN O'CONNOR<br>1201 North Market Street<br>Suite 1001<br>Wilmington, Delaware 19801 |
| For Harbinger Motors: | John Morris, Esquire<br>PACHULSKI STANG ZIEHL & JONES LLP<br>780 Third Avenue, 34th Floor<br>New York, New York 10017 |

(APPEARANCES CONTINUED)

| | |
|---|---|
| Audio Operator: | Dana L. Moore, ECRO |
| Transcription Company: | Reliable<br>The Nemours Building<br>1007 N. Orange Street, Suite 110<br>Wilmington, Delaware 19801<br>Telephone: (302)654-8080<br>Email: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Kasai North America: Kimberly Brown, Esquire
LANDIS RATH & COBB LLP
919 Market Street
Suite 1800
Wilmington, Delaware 19801

For Cosma International Group of Magna International: Brendan Best, Esquire
VARNUM LLP
480 Pierce Street, Suite 300
Birmingham, Michigan 48009

For the Hanover Insurance Company: Scott Zuber, Esquire
CHIESA SHAHINIAN & GIANTOMASI, PC
105 Eisenhower Parkway
Roseland, New Jersey 07068

For CHEP Container & Pooling Solutions: Gary Marsh, Esquire
TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street, NE
Suite 3000
Atlanta, Georgia 30308

For WHS Energy Solutions: Anthony Clark, Esquire
GREENBERG TRAURIG LLP
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801

For Altair Engineering, Inc.: Curtis Miller, Esquire
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899

Eric Chafetz, Esquire
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, New York 10020

INDEX


| MOTION: | | PAGE |
|---|---|---|
| Agenda Item 1: | Application of Chapter 7 Trustee to Retain Munck Wilson Mandala, LLP as Special Counsel for Intellectual Property Matters [D.I. 35; filed: 2/19/2025] | 5 |
| | Court's Ruling: | 11 |
| Agenda Item 2: | Chapter 7 Trustee's Motion for Entry of an Order: (A) Approving Asset Purchase Agreement Pursuant to 11 U.S.C. § 363 and (B) Granting Related Relief (the "Sale Motion") [D.I. 51; filed 3/4/2025] | 13 |
| | Court's Ruling: | 76 |

| EXAMINATION: | PAGE |
|---|---|
| JEOFFREY BURTCH | |
| Cross-examination by Mr. Morris | 30 |
| Redirect examination by Mr. Felger | 47 |
| Re-cross examination by Mr. Morris | 50 |

| DECLARATIONS: | PAGE |
|---|---|
| 1) Jeoffrey Burtch | 21 |

(Proceedings commence at 11:47 a.m.)

(Call to order of the Court)

THE COURT: Please be seated. Good morning.

Mr. Felger, good morning, its good to see you.

MR. FELGER: Good morning, Your Honor. Great to see you as well. I think the last time I was before Your Honor in person was first days in Cosi where I handed you two sandwiches and you accused me of offering a bribe and then --

THE COURT: And I took it.

(Laughter)

MR. FELGER: -- Judge Sontchi emails me later in the day and says, Felger, don't you understand there are five Judges here.

THE COURT: You didn't bring enough for everybody. Its good to see you.

MR. FELGER: Good to see you as well. Mark Felger, Cozen O'Connor, for Jeoffrey Burtch, the Chapter 7 Trustee.

We are here, Your Honor, in the Canoo Inc., *et al.*, Chapter 7 cases. Its our first time, I think, before Your Honor in this case or these cases, which have been pending for, I guess, roughly 90 days at this point.

I guess we will just dive into the agenda unless Your Honor has anything preliminary.

THE COURT: No, that would be fine.

MR. FELGER: Okay, so we have just two matters on the agenda, Your Honor. The -- and I will take them in the order on the amended notice. Does Your Honor have the amended notice?

THE COURT: I have the amended notice, yes.

MR. FELGER: Okay, and apologies for filing the revised notice of -- notice of revised order last night and the declaration last night.

THE COURT: I'm happy to get it.

MR. FELGER: Really wanted to get it to you nightfall.

So, on our first matter, Your Honor, the application of Mr. Burtch to retain the Munck Wilson Firm as special counsel, as its titled, for intellectual property matters. We filed that, we served it out, Your Honor. We have received one objection to that application. I think it's important to note that the U.S. Trustee did not object to this application. No creditor objected to this application. The only objection comes from the defendant in that particular piece of litigation that has been pending for about two years in the Federal Courts in California. It's a pretty high stakes misappropriate of trade secrets case, Your Honor.

So, when we first got involved in the case we were apprised of this litigation, not only through the schedules

but by the principals of the debtor who felt strongly about this litigation. They put a pretty high value on this litigation. We learned that it has been pretty hard-fought. Contingent fee counsel says they have probably invested upwards of 6,000 hours into this case already.

Just recently an order was entered substituting the trustee as plaintiff in that case, which has caused a number of deadlines to be set in that litigation including deadlines as early as later this month. And as a matter of fact, we were served with a 30(b)(6) deposition notice for Canoo Inc., by the defendant in that litigation.

So, we have one objection, Your Honor, and its really very limited. It's a one-pager and the issue is the deal that was cut, the understanding that the debtor had with this firm, at the time of the petition being filed, 50 percent contingency with the law firm picking up all of the expenses. So, we got involved, we spoke with this law firm, we were impressed by this law firm, and decided to file this retention application on the same terms, effectively, as they had in place with the debtors pre-filing. We thought it was reasonable and appropriate given the type of litigation. It is the amount of time that has been invested and that will need to be invested going forward. The fact that they're paying the expenses out of their pocket, including expert witness fees and, as I mentioned, it's the sort of litigation

that could go on and on for years.

So, certainly Cozen would not do it for any better terms then what is proposed and we do a heck of lot of contingent fee work, as Your Honor knows. So, we think it's reasonable and appropriate. We normally, on filing a CNO for applications like this, and the orders are entered routinely. We, as I noted, just have one objection by the defendant in the litigation. Took offense at the 50 percent and said it should be 35 to 40. We would love it to be 35 to 40, Your Honor, and we asked for it to 35 t0 40 and the law firm said no thank you.

What I find interesting though is that, as I noted, the U.S. Trustee did not object, no creditor objected. Harbinger has filed a proof of claim and it's a contingent unliquidated claim, Your Honor. It's a claim that would arise if they were to prevail in the underlying litigation and convince the Court that it was a bad faith undertaking by Canoo and now the Trustee.

I would note that Canoo has already survived a motion to dismiss in that action and the Court has now entered a bunch of orders ready to roll forward with discovery, which I expect will be pretty intensive. I read a bunch of memos on this litigation, Your Honor. It is very interesting. It is far from bad faith.

THE COURT: It is. From my point of view, it is

somebody else's problem.

MR. FELGER: Right, somebody else's problem. But what I would note, Your Honor, it's hard for me to look at Harbinger as a creditor of this estate given how attenuated its claim is. It has to win on that litigation and convince a Court there was a bad faith filing when Canoo has already withstood a motion to dismiss.

I would also point out, and it's very odd, because they're objecting to the 50 percent saying it should be 35 percent but they only have standing to raise it if they're a creditor. How do they become a creditor? They become a creditor if they win in the litigation and convince the Court to award legal fees because it's a bad faith filing.

So, at the time they become a creditor of the estate, the Munck Wilson Firm has no entitlement to a fee; they've lost. So, they're going to be saddled with a million dollars of expenses and legal fees are moot. And if, in fact, we prevail on that litigation and Munck Wilson becomes entitled to a 50 percent contingent fee, Harbinger is not a creditor because they've lost and they're not going to receive an attorneys fee award if they lost the case.

So, to me its almost an absurdity. You know, our view is, Your Honor, first of all, they don't have standing here. They really shouldn't have standing. No creditor to date has objected to this. The U.S. Trustee hasn't objected

to this and this is just a defendant trying to impair the Trustee's ability to move forward in this litigation which could be a very significant asset of this estate.

So, Your Honor, I have Mr. Burtch in the courtroom. I also have Mr. Wilson on the Zoom, I believe. He is one of the lead attorneys for this retention in the event that Your Honor has questions. They did submit a declaration in support of the application. So, they're available and we would ask that the objection be overruled and that we be allowed to retain this law firm to dive in and proceed with that litigation.

THE COURT: Very good. Let me hear from the objector.

MR. MORRIS: Good morning, Your Honor.

THE COURT: Mr. Morris, welcome.

MR. MORRIS: John Morris, Pachulski Stang Ziehl & Jones, for Harbinger.

I have no sandwiches or bribes, so let's get that out of the way.

(Laughter)

THE COURT: You know, we have to dial this back. One of my goals in life is not to leave this job in handcuffs.

(Laughter)

MR. MORRIS: I hope I helped you get to that

honest goal.

Your Honor, I will tell you that its unfortunate that to my knowledge I'm hearing for the first time that this fee arrangement was in existence prepetition. I don't believe that its written in the application. I don't believe that it was described in any reply. I have never seen any evidence of it. I think it was perfectly reasonable to object because, to the best of my knowledge, and my colleagues knowledge we have never seen a bankruptcy court approve a 50 percent fee.

So, it struck us as unusually high and that was the reason that we objected. It's a one-pager. It was a contingency fee of a magnitude that we have never seen before but had we known beforehand -- and we had some discussions, and it was never brought up. Had we known that it was the continuation of an existing fee arrangement we might have reconsidered the objection. And if we could see some proof of it -- I assume there is a retention agreement.

I would have expected them to have offered into evidence the original retention agreement that would have proven what has been represented to the Court today, not that I doubt counsel's representation, but that is certainly what I would have done. I certainly would have picked up the phone and said, hey, guys, we're all wet here because we're just continuing the prior arrangement. We didn't have that

opportunity and lacking that opportunity we saw a contingency fee that was out of market and that is why we objected.

So, I would say, Your Honor, if the debtors can provide proof just give us the contingency fee, we will withdraw the objection. It's that simple.

THE COURT: Mr. Felger, anything to add?

MR. FELGER: I would say two things. I would say, first, its not relevant. It's the Trustee's application. The Truste has agreed to these terms. And I would also say I did have a conversation with Mr. Sandler about this and I told him, when he expressed his concern about that, that we were just going ahead with the debtors arrangement. I had that conversation with Mr. Sandler.

Again, I think its irrelevant. It's the Trustee's application and these are the terms that the Trustee has agreed to. Whether it was the same as the debtor had entered or not, it's a factor but, again it's the Trustee's application and -- (Phone ringing) -- excuse me, Your Honor.

THE COURT: I'm supposed to seize that.

MR. FELGER: I'm out of practice, Your Honor. I thought I turned it off. My apologies, Your Honor.

THE COURT: I've heard enough. I am going to overrule the objection. I note a couple of things.

First, a Chapter 7 Trustee is accorded significant deference in his determination of how to best administer the

case and that extends to the terms under which he would engage professionals. Again, the Court is certainly prepared to accord him the deference that both case law and practice reflect.

I note that a 50 percent contingency fee is higher then the typical, which is around a 35 to 40 as counsel has noted, but it certainly is not something that I have not seen and I have seen sharing arrangements with Chapter 7 Trustees often involving secured creditors where the recoveries are even more dramatic. And the trustee, again, uses his -- the information in front of him as well as his business judgment to determine what would be in the best interest of stakeholders and creditors.

So, it's not dependent upon whether or not this arrangement was in existence prepetition. Indeed, the filing of a Chapter 7 case, in many instances, results in counsel having that discussion and changing terms of an engagement because the circumstances have functionally changed given the filing. In this instance, again, I don't need to get deeply into the parties issues and concerns. This is a significant litigation that is pending. I make no comment on the substance of it and I was a little bit flip earlier but this is a matter pending in another court. I have limited visibility into it but the Trustee has made a determination that it is a cause of action that potentially has value and

ought to be pursued and has engaged counsel to accomplish precisely that.

So, based upon the record before me I am satisfied that the Trustee has carried his burden under Bankruptcy Code Section 327. I would approve and authorize the retention of counsel on the terms that have been identified. I guess its 327 and 328. So, I would look for that order to be uploaded and I would enter it, okay.

MR. FELGER: Thank you, Your Honor. We will upload that order.

Okay, that brings us to the second matter on the agenda, Your Honor, the sale motion. So, Your Honor, we filed the sale motion back in early March. I believe it was on or about the 4th of March. It was the culmination of several weeks of discussions with an entity that was formed by the principal of the debtors. I can say with conviction that we must have had, at least, a dozen rounds of offers and counteroffers, and a tremendous amount of moving parts.

It wasn't just your simple, we'll pay you X for a bunch of widgets. We had a credit bid piece of it that we had to analyze to make sure that it was a valid credit bid. We had the cash component. We had the assumption of administration expenses. We had negotiation on the assumption of contracts and leases. We had a discussion about the Harbinger litigation that we just talked a little

bit about. We also had, as part of this, a settlement or, I guess, a purchase of certain, what we call, buyer preference claims, potential preference claims against a handful of former employees of the debtors.

So, it was arm's length. It was good faith, notwithstanding we were dealing with an insider. It was hard-fought. There were a bunch of times I thought we were done and not going forward. And part and parcel of that negotiation was how we were going to effectuate the procedure. As Your Honor knows, typically, certainly in the Chapter 11 world, you have a two-phase approach to these sales, you file a motion, you have a hearing in two, three weeks on bid procedures and then you have your sale hearing 30 to 60 days later.

Here, we really didn't have the luxury of a three to four month solicitation period for a whole host of reasons. One being the limited resources in the estate. Two being the fact that the insurance was subject to a premium finance arrangement with a monthly amount of close to $350,000. And we had a buyer that wanted to move very quickly, very quickly given the relationship -- principally a relationship with NASA, with NASA having a launch next month and the need for technicians to be able to move the astronauts to the launch pad with the three Canoo vehicles that they purchased.

On top of that we have an enormous burn rate in this estate between the three or four leased facilities. We have utilities, we have batteries stored in a bunch of locations, we have --

THE COURT: They need to be climate controlled.

MR. FELGER: And they do, and at least one location is not climate controlled. So, there were a whole host of factors that led us to ultimately agree with the buyer to proceed by way of, sort of, a modified private sale. Of course, they wanted it on a more expedited basis and we basically said no way are we going to do this in less then a month.

So, we comprised and we set about a four-week objection deadline tied to a bid deadline. So, the objection deadline was the bid deadline. We set it at March 28th, I believe. And we had a -- the debtor had established a data room. So, we had that up and running. We had a bunch of folks -- I think seven or eight folks signed NDA's, got into the data room, did a lot of diligence. We had a whole host of communications with potential buyers including Harbinger. Harbinger, I think, spent the most time in our data room and downloaded upwards of 9,000 documents. At one point I thought they were going to come in with a bid. They got really close, I understand but they're not here today with a bid. We had two or three others that were close. We had a

couple of small bidders that just wanted IP or just wanted miscellaneous assets.

So, you know, even though it was only a four-week period, we feel we had a bunch of interested folks doing diligence, trying to put bids together. We had one that got really close. I got an email this morning from these folks and its just they got close but they didn't confirm their financing. They didn't -- they weren't clear on a bunch of items in the agreement. The ownership was such that -- and this is kind of a pervasive theme here was such that we thought might have CFIUS issues because of the international -- there is international interest in these --

THE COURT: I've dealt with this.

MR. FELGER: -- assets and there's national security type issues. This debtor dealt with the Department of Defense, NASA, and other government agencies. So, we are very sensitive to that. We have experts in our firm that deal with CFIUS all the time and they confirmed for me that these are real concerns and it could cause a delay, if not a lack of approval at the end of the day.

As I mentioned, with the burn rate of this case, with these various locations and their enormous locations, you know, if you delay this two, three months you are looking at an additional administrative freight of north of a million bucks that we don't have to spend. So, there are a lot of

concerns around all of those factors that I just mentioned, Your Honor, in terms of moving us ahead. We also, at the same time, Your Honor, we -- as Your Honor knows, we retained Hilco to do an appraisal of our machinery equipment and our IP. We wanted to make sure that if no other qualified bid came forward that we had another check on the liquidation value of these assets.

Certainly, if Hilco would have come in at a higher number we would have been renegotiating with this buyer or walking from that deal but they came in, we submitted Mr. Burtch's declaration. It sets out Hilco came in at $6 and a half million on a liquidation valuation of the M&E and the IP. So, that was a second check we had in addition to the process. Granted, it wasn't a lengthy process but it was a process nonetheless that continued right up till today.

So, as mentioned, we had a March 28th deadline but we had been talking with people right up to today. So, effectively, it was another 10 days or so of providing information to people, communicating with people to try to get the best offer we could.

A few things to note, there is no releases here of Mr. Aquila and the Trustee certainly is cognizant of potential D&O claims here and we will be investigating those claims. Those are unfettered by what is happening here today under this sale. We have excluded all cash, all AR, all

causes of action except the limited buyer preference claims. We have retained the Harbinger litigation, and I will get back to that in a minute. And also, a potential claim against Panasonic. It was a prepayment of $30 million to Panasonic prior to the filing and we carved that out of the sale so, the estate can pursue that recovery as well.

So, we think we have gone a long way to preserve the material remaining assets and causes of action. And --

THE COURT: If I can ask, the agenda reflects that there are a number of objections. I have reviewed all of the objections. The Harbinger objection seems to be placed in a somewhat different category. There are trade vendors or counterparties that have filed objections but I think the agenda recorded that negotiations were ongoing. I think I would like to understand what is on my dance card.

MR. FELGER: Sure. The only objection for today is Harbinger.

THE COURT: Okay.

MR. FELGER: All of the -- there are 12 objections filed, Your Honor. The other 11 objections have all been either resolved, mooted or adjourned.

THE COURT: That is kind of what I -- I just wanted to make sure, that is kind of what I expected given the nature of the objections and the report from the Trustee about the process going forward but, again, I just needed to

get some understanding.

MR. FELGER: Right. So, I can walk through each of them if you want but suffice it to say the revised order that we submitted last night was fully vetted and I thank Mr. Milmoe and his team. They really carried the water on that. It has been vetted with them. They are all signed off. There are a bunch of them in the courtroom today. We fully reserved all their rights.

I think in the end there's probably four or five of those that the buyer and the counterparty are going to have to negotiate. Nobody wanted that to just, sort of, languish. So, we built in that -- the parties will negotiate till April 23rd and we have a blank in the order to fill in the date for a hearing so we can come back with, hopefully, only or two that need to be dealt with but I think everybody wants to try to get back before Your Honor within a week or so after the 23rd.

THE COURT: I can accommodate that.

MR. FELGER: Okay.

THE COURT: Let's talk about mechanics. We have Mr. Burtch's declaration. Are you looking to put Mr. Burtch on, are we looking to admit his declaration. I just want to know.

MR. FELGER: Yeah, I was intending to admit his declaration and offer him for cross to Harbinger. That was

my plan. We are really looking at one issue and that is the aspect of the APA where the Trustee --

THE COURT: The 10 percent.

MR. FELGER: There's three aspects that Harbinger raised. There is the 10 percent that is being provided to the buyer. There's the consent right, which I think is the aspect that really sticks in their crawl, that we have agreed to that goes sort of hand-in-hand with that. Then they raise the issue of bearing the expenses that they -- I think they misread it because what is happening is Munck Wilson is burying all the expense of the litigation and if we prevail, if that comes off the top, then we split the net of the estate's 50 percent, 10 percent goes to the buyer.

It was a hard-fought negotiation. They wanted the Harbinger litigation in its entirety and we said no, we're not doing that unless you want to pay a lot more money for it. We had a lot of back and forth on that. Ultimately we agreed to what we agreed to because we realize that Mr. Aquila and his team are vital, are critical to the success of that litigation. They're going to be fact witnesses. They know what happened and we need them vested.

The second aspect of that is that in the end, if we prevail, it would be not only monetary damages, it would be some sort of injunctive relief. From my perspective the monetary relief is most important. From the buyers

perspective it's the injunctive relief because they're buying IP and they're going to want an injunction in place. So, that is how that all came together, Your Honor.

THE COURT: Why don't we do this, I would like to know, is there an objection to the admission of the declaration subject to the opportunity to cross?

Mr. Morris.

MR. MORRIS: No, Your Honor.

THE COURT: Alright, then I think you probably ought to move the declaration and then I assume, Mr. Morris, you wish to cross?

MR. MORRIS: I do, Your Honor. I do have a brief opening that I --

THE COURT: And I will certainly afford you that.

Alright, are there any objections to the admission of Mr. Burtch's declaration as part of the Trustee's case in chief for purposes of the sale motion?

(No verbal response)

THE COURT: Very well. Subject, obviously, to the opportunity to cross-examine Mr. Burtch's declaration is admitted.

(Burtch declaration received into evidence)

THE COURT: I would be happy to entertain -- you know what, before I hear your opening if the purchaser has any opening comments. I did receive a reply from the

purchaser and that way, Mr. Morris, you would have an opportunity in your opening comments to address anything that is raised in terms of the proponents of the sale transaction.

Mr. Clark, good afternoon. Its good to see you.

MR. CLARK: Good afternoon, Your Honor. I had to scratch out my note that said good morning. Tony Clark of Greenberg Traurig for the proposed buyer, WHS Energy Solutions LLC. And with me in the courtroom, Your Honor, is my lifelong partner, Greg Milmoe, with whom I know you are well acquainted.

THE COURT: He just followed you, didn't he?

MR. CLARK: Well, actually no, it was the other way around.

THE COURT: Mr. Milmoe, its good to see you.

MR. CLARK: Your Honor, I really don't have much to say --

THE COURT: I do have your reply and I appreciate it.

MR. CLARK: -- beyond what we put in the reply. I would just want to make one observation with respect to the transaction that we negotiated here. In effect, while this is an unusual slave process, it's not the normal sort of auction with milestones and the like because of all the facts that Mr. Felger pointed to with what they say in their papers, but I would observe that WHS here has, effectively,

stepped in as an unpaid, uncompensated stalking horse buyer. There is no breakup fees involved, there is no bidder protections involved. The Trustee has a full unfettered fiduciary out if there was some competing bidder coming in that they thought was better.

We did purchase the insider preference claims for $500,000 of cash but beyond that there are no leases for any potential claims that the estates may have against anybody in the transaction. So, under the circumstances it seems an incredibly favorable arrangement from the estate's perspective and we're happy to go through with it.

With respect to Harbinger's objection all I will say is that their motive in objecting as the defendant in an eight figure trade secret litigation is, I think, fairly transparent. We pointed out in the reply why the Harbinger objection is factually wrong. The one specific error I would point to, as they say, we would receive 10 percent of the upside without bearing any of the expense on the downside but the agreement specifically provides that WHS is obligated to assist and cooperate with the Trustee at WHS's expense in prosecuting the litigation. Obviously, we have a real interest in seeing that litigation succeed because, as Mr. Felger points out, we do want that injunctive relief that goes along with the assets that we are prepared to buy.

So, we think the objection should be overruled and

unless Your Honor has any questions I will sit down and listen to others.

THE COURT: No, I don't have any other questions.

MR. CLARK: Thank you, Your Honor.

THE COURT: Mr. Morris.

MR. MORRIS: Thank you, Your Honor. Harbinger Motors Inc., is a creditor. They filed a proof of claim. It hasn't been objected to and under the law they have a right to be heard today. So, we need to get past that. They are a defendant in this prepetition lawsuit. There is no question about that. We said it in the first sentence of each of our objections because it's not something that we shy away from. The allegation is that Harbinger stole trade secrets. We will talk about that in a little bit.

The proof of claim was filed on March 17th. Its Proof of Claim Number 54. We think it will ultimately be a valid claim. This is not the time or the place to talk about the merits of the lawsuit.

THE COURT: I honestly don't want to debate about standing. The parties have beat up significant issues. I understand the argument but I generally take Judge Walsh's approach with this which is that I don't decide on standing until I get to the end. So, I am going to hear on everything. I appreciate the argument but given the issues that have been raised and the Trustee's desire to move forward with the sale

transaction this is not typically something that I would just deal with on standing.

You may proceed.

MR. MORRIS: Thank you, Your Honor. So, now I want to address the strawman that have been created because its virtually everything that has been testified to at the podium just now. I will focus specifically on Paragraph 8 of the buyer's reply. I need to dispel certain very inaccurate statements that are made by the buyer therein.

Harbinger is not obstructing in any way the sales process or the Trustee's liquidation of assets. We have no objection to the sale motion except for three very, very limited points. So, the Court will say "yay" or "nay" on those three points and, otherwise, Harbinger has no objection to Mr. Aquila being the buyer. Harbinger has no objection to the sale motion. We are not trying to stop the sales process. So, we need to be really crystal clear what is happening here today.

Harbinger is not trying to stop or disrupt the litigation in any way. Harbinger consented to the Trustee appearing as the plaintiff in the action. As counsel pointed out, Harbinger is actively participating in the litigation, complying with the Court's order to seek discovery to find out after two years what the trade secrets are that Canoo contends have been infringed.

So, despite the language that is in those paragraphs, we are here today for a very limited purpose. We are not here to stop the sales process. We're not here to interfere with the litigation. I do have to address, unfortunately, the statement in the buyer's reply that suggests that Harbinger did something wrong with respect to confidential information. Harbinger didn't put any information in the data room. Harbinger was permitted to be in the data room.

There was a point in time, perhaps a month ago, when the debtors' counsel raised an issue. We pointed these things out. They said, Oh, never mind, harbinger hasn't done anything wrong and we were allowed as counsel to continue to do our due diligence, we believe, on the same basis that everybody else did.

So, it's regrettable that there would be an accusation that Harbinger has engaged in wrongdoing; an accusation that has no evidence. There's no proffer. There's nothing of any kind and we object to it.

And I just -- I've got my client on the phone if people really want to press the issue, but we did put in the exhibit binder the email exchange between me and Mr. Felger on this topic and Your Honor can see, he raised the issue, I addressed it, and he said we're good here, and we moved forward. So, I don't know why they put that in last night,

but it's really unfortunate.

So, why are we here? What are the reasons that we are objecting? And, you know, we've already dealt with the objection to the retention motions, so there's three very limited objections that we're left with.

The first one, and counsel is right, the most important one for us, is the sentence in Section 7.3 of the APA that grants the buyer consent rights over any settlement. We believe that is wrong as a matter of law. We don't believe that a trustee can delegate his fiduciary duties. We don't believe that a trustee is authorized to allow a third party with no ties to the estate, with no fiduciary duty to the estate to make a decision as to whether, when, and on what terms to monetize assets.

Section 704 is clear: The trustee's duty is set out in 704(a), (a)(1), and (a)(2) and you cannot comply with those duties if the decision as to when, where, and an what terms to monetize assets is placed in the hands of a third party. We have no objection to the consultation, right, which is the sentence that precedes the offending one. But it is very important to us and it should be very important to all creditors of the estate that the trustee and the trustee alone is the one who decides when, whether, and on what terms to monetize estate assets.

They've agreed to give 50 percent of any recovery.

We don't think there will be any recovery, but they've agreed to give 50 percent to the lawyers. They've agreed to give 10 percent to the buyer. They're still left with 40 percent. That's an estate asset. Only the trustee should be permitted to decide how that is disposed of.

The next issue concerns the trade secrets themselves. The litigation has gone on for two years. Harbinger has tried every which way to get the debtor -- and I guess prepetition, it was Canoo Technologies -- to actually identify the trade secrets that are at issue and that they have been unable to do so. And that's why the Court just ordered Canoo to appear for a deposition to finally identify the trade secrets.

And a point about the trade secrets, Your Honor, there's no intellectual property that's involved in the litigation in California. That's just wrong. There are no patents that are involved in that. There's no trademarks that are involved in that.

It's these ephemeral trade secrets, okay, and we'll hear what the trustee has to say, but our understanding is that Mr. Aquila knows what the trade secrets are, but no prospective bidder was ever told what the trade secrets are; they don't know the value of the trade secrets. And this is the portion of our objection, where we say this was not an even playing field, that only Mr. Aquila supposedly knows

what these previously unidentified trade secrets are.

And if -- you know, we'll see -- I just want to pause there and do my cross. I didn't take a deposition. I've done this long enough and I've gotten to the point that sometimes I decide it's better to hear it for the first time, because otherwise people sometimes prepare and rearrange their thoughts. So I'm going to hear this live and in color, just as Your Honor will for the very from time to time, and we'll see what the trustee knows and what the trustee doesn't know.

But we are very concerned that an alleged asset of the estate -- we don't think there are any trade secrets, we'll put that aside; the debtor obviously does, because they're supposedly selling them -- do we know what that asset is? And how come nobody else has been allowed to bid on it because they don't know what it is.

THE COURT: What's your third point?

MR. MORRIS: The third point, it has to do with the failure of the buyer to pay its *pro rata* share of the expenses and potentially the legal fees that will be due and owing if our claim comes to fruition.

So, I'm presenting the three issues in the order of importance to Harbinger and I'll just leave it at that.

THE COURT: Okay.

MR. MORRIS: Thank you, Your Honor.

THE COURT: Okay. At this point, then, I think we should call Mr. Burtch.

Good afternoon, sir. Good to see you.

MR. BURTCH: Good to see you too, Your Honor.

THE COURT: Please remain standing and we'll swear the witness.

THE CLERK: Do you solemnly -- please raise your right hand.

JEOFFREY L. BURTCH, TRUSTEE'S WITNESS, SWORN

THE WITNESS: I do.

THE CLERK: Please state and spell your last name for the record.

THE WITNESS: Jeffrey L. Burtch, B-u-r-t-c-h.

THE CLERK: Thank you.

THE COURT: Welcome, sir.

THE WITNESS: Thank you.

THE COURT: Mr. Morris, you may proceed.

MR. MORRIS: Thank you very much.

CROSS-EXAMINATION

BY MR. MORRIS:

Q Good afternoon, Mr. Burtch.

A Good afternoon.

MR. MORRIS: I guess Mr. Robinson, could we pass out the witness binders?

THE COURT: Yeah, that would be great.

(Pause)

THE COURT: I think I have a set. I'm good.

MR. MORRIS: May I proceed, Your Honor?

THE COURT: You may.

MR. MORRIS: I'll try to be as direct and quick as I can, here.

BY MR. MORRIS:

Q Mr. Burtch, are you ready?

A Yes.

Q Okay. My name is John Morris. I'm from Pachulski. I'm here for Harbinger and I just have a few questions.

You've served as a trustee for many years, right?

A Many.

Q And you're a lawyer, right?

A I am.

Q And you understand that as the trustee, you owe fiduciary duties to the debtor and the debtors' estates?

A I do.

Q And you're familiar with Section 704(a) of the Bankruptcy Code, right?

A Yes.

Q And you understand that under 704(a) of the Bankruptcy Code, one of your duties is to collect and reduce to money, the property of the estate, right?

A Correct.

Q And you also understand that under 704(a)(2), you also have the duty to be accountable for all property received, correct?
A I believe that's correct. I don't have 704 in front of me, but that's my understanding.
Q Okay. And one of the assets of the estate is the trade secret litigation against my client Harbinger, right?
A Yes.
Q And we may not agree on the merits or the value of those claims, but you agree that the claims asserted in that lawsuit are property of the estate, correct?
A Correct.
Q And we're here today on your motion for approval of the sale of assets to an entity called WHS, right?
A Correct.
Q And you understand that that entity is controlled by Mr. Aquila, correct?
A I understand that.
Q And you also understand that until the petition date, he was, Mr. Aquila controlled the debtors in his capacity as the CEO, correct?
A I understand that.
Q Does he have any role with the debtors today?
A You mean the debtors' estate or do you mean the debtor?
Q Is he employed by the debtors?

A I don't know.
Q You don't know.
Do you know if he remains an officer or director of the debtors?
A I don't know.
Q Did you ask anybody?
A I didn't.
Q Do you have any reason to believe that Mack owes any duties to the debtors or their estates as of today?
A I have no idea.
Q Did you ask anybody?
A I did not.
Q Okay. Is it your understanding that since your appointment, you are the sole trust, you are the sole fiduciary authorized to act on behalf of the debtors and therapy estates?
A I understand that.
Q Okay. You're not aware of anybody else having fiduciary duties to the debtor or the estates, correct?
A Certainly none.
Q And you negotiated the APA with Mack and his counsel, correct?
A Correct.
Q And the negotiations were at arm's-length, as we heard; is that right?

A Correct.
Q And that's because you were looking out for the debtors' best interests and Mr. Aquila was looking out for his own personal best interests, correct?
A No, I was looking out for the interests of the creditors of this estate, not the debtor.
Q Okay. Fair enough.
So, when you were negotiating, you, as the estate fiduciary, was looking out for the best interests of the debtors, the debtors' estates, and all their stakeholders; is that fair?
A I was looking at the value, potentially, of the assets and to maximize that value to the best I could for the benefit of the creditors of the estate.
Q Okay. But Mr. Aquila's goal was the opposite, right; to pay as little as he could and to get as much as he could --
A I don't know what Mr. Aquila's goal was.
Q Is it fair to say that you understood that he wasn't representing the interests of the creditors during these negotiations?
A He was a creditor.
Q Was he representing -- was it your understanding that he was negotiating on behalf of all the body of creditors?
A I don't know who he was negotiating for.

Q Okay.
A I knew what I was negotiating for.
Q Okay.

MR. MORRIS: Your Honor, I do want to clarify that was the back-and-forth between you and counsel, and that is, Harbinger does not object to the transfer of the 10 percent interest of the net Harbinger recovery to the buyer. That's not the objection; the objection is the consent right and the objection is to the trade secrets and the objection is to the failure to impose --

THE COURT: To pay some of the freight for the litigation.

MR. MORRIS: Yeah, I just want to clear that because --

THE COURT: No, I think that's been clarified. I appreciate that.

MR. MORRIS: Okay.

THE COURT: You may proceed.

BY MR. MORRIS:

Q So, under the proposed APA, the debtors are going to transfer 10 percent of what's been defined as the net Harbinger recovery; is that right?
A Say that again.
Q Do you recall that one of the things the buyer is going to purchase is a 10 percent interest in the net Harbinger

recovery?
A Yes.
Q Okay. And if you take a look at the APA, which is, I think, it's Tab 1(a), and if you'd be kind enough to turn to page 21, you'll see at the bottom, Section 7.3, that refers to the Harbinger matter.
A I see it.
Q Do you see that, sir?
A Yep.
Q And in the second sentence, it says:
"Any settlement of the Harbinger matter shall require the mutual consent of seller and buyer."
Have I read that correctly?
A Yeah, I read it.
Q Okay. You're aware that Harbinger objects to that particular sentence?
A I'm very aware of that.
Q Okay. You filed a declaration last night; is that right?
A Correct.
Q Did you review that declaration before you signed it?
A I did.
Q Do you recall if there's anything in that declaration that even addresses this issue?
A I don't recall.

Q Okay. So under Section 7.3 of the APA, if the Court approves this, you cannot settle the Harbinger litigation unless you get Mr. Aquila's consent; is that correct?
A Correct.
Q So, stated another way, unless Mr. Aquila consents, you cannot accept a settlement with Harbinger, even if you believe it's in the estate's best interests; is that right?
A That's correct.
Q How would -- can you explain to the judge how you believe you could fulfill your fiduciary duties to the debtors, the estates, the creditors under 704 if you surrender the right to monetize the asset at a time and a place and on terms that you think is in the estate's best interests?
A Sure, I can explain.
Number one, the U.S. Trustee has not objected. Number two, my duty is to maximize value for the estate, period. I believe that any buyer of this business realizing the litigation against Harbinger involved the misappropriation of trade secrets is valuable and would not buy interest unless they had an interest in that issue, including consent.
Consent is a critical to any buyer, understanding this litigation, for injunction purposes. If the injunction is successful, then the value of that debtors' business goes up dramatically; that's why consent is necessary for them.

A trustee doesn't necessarily look at that consent issue; a trustee looks at maximizing value for creditors. That's a money value. So that's the interest that the estate has, I have, and I felt that because of that consent issue, I would be able to entice a buyer to come in with that provision. We didn't get any other buyers and nobody asked about trade secrets at all or the litigation, to my knowledge. Counsel may have a different view, but I'm not aware of that, that's why I did it.

Q Okay. So that -- let's just play this out. So that if we're in negotiations or in mediation and we make an offer that you think is in the best interests of the creditors and Mr. Aquila disagrees, you have no recourse, there's nothing you can do, and you cannot act on in the best interests of the creditors; do I have that right?

A You keep forgetting that Mr. Aquila is a creditor and that it's not in the best interests of all creditors. I'm looking to maximize value and, also, I think that the consent issue is something that I considered and I think he is entitled to have that 10 percent interest and also consent.

Q Have you ever ceded --

A But let me add something to that.

Q Sure.

A It's not critical to the deal. It may be critical to the deal with the buyer. It's not critical to the deal with

me, consent, because I could tell you right now, as to my fiduciary duty, I may not consent anyway, even if Harbinger offers five million, period. I don't know what I'm going to do down the road.

Q I appreciate that. That's not the hypothetical.

The hypothetical is you get to a point where you actually want to accept the deal, right?

A Say that again in another way.

Q Yeah, the hypothetical is you get to a point in time where you say, You know what guys? I've now heard the other side. I haven't just heard from Wilson and Mr. Aquila. I see the problems in the litigation. I'm in a mediation.

I've been presented with an offer that I think maximizes value for the estate and in the estate's best interests, but Mr. Aquila says, No --

A I understand.

Q -- I don't want to do that.

You have lost the ability to act on behalf of the estate and its creditors, correct?

A I understand your position.

Q Okay. Have you ever done this before where you gave up control over the disposition of an estate asset?

A I don't recall that.

Q Have you ever seen a case anywhere where a Court has approved the surrender of fiduciary duties concerning the

disposition of estate assets?
A I didn't research the issue.
Q Okay. Let's move on to trade secrets.
One of the estate assets being sold under the APA is intellectual property, correct?
A Correct.
Q Okay. If we could turn to page 9 of the APA just so that --
A Page what?
Q -- clear for everybody here.
Page 9.
A Do you have the exhibit number?
Q It's the same exhibit, sir.
A Okay. Page 9?
Q Yeah.
A I have it.
Q Okay. So Article 2 is the purchase and sale provision of the APA, correct?
A Correct.
Q Article 2.1 sets forth the assets that are being sold, correct?
A Correct.
Q And in Clause B, what's being sold is the intellectual property with a capital I and a capital P, correct?
A I see that.

Q And if you flip back to page 5, you have your definition of intellectual property?
A Okay.
Q And down towards the bottom, included within the definition of intellectual property, in Subpart (e) are trade secrets, right?
A Okay.
Q So, you would agree that under this APA, the debtors would be selling its trade secrets to the buyer, correct?
A Correct.
Q Okay. Do you know what trade secrets are being sold?
A I do not.
Q Did you ask?
A I did not.
Q Do you have any idea if any exist?
A I don't know what a trade secret is, how about that?
Q Okay. Did you seek any advice to find out what a trade secret is?
A No.
Q How can you exercise your business judgment to sell trade secrets if you don't know what they are, you don't know whether they exist; like, how do you do that?
A Well, nobody's bid on them.
Q Well, somebody has; the buyer, right?
A Yes.

Q And the buyer is the insider, right?

A My understanding is that that same question is being raised by Harbinger in the Federal Court in California: What is a trade secret?

Q We certainly are.

A And Harbinger hasn't responded to that yet --

Q Okay.

A -- right?

Q But we're here today --

A I don't know.

Q -- on the sale motion, right?

A The debtor didn't disclose to me what the trade secrets were.

Q And you didn't ask, correct?

A I didn't ask.

Q And so you don't know what you're selling when it comes to trade secrets, right?

A I do not.

Q And you have no idea if they have any value at all, right?

A Well, if I listen to you and your proof of claim, it has no value.

Q Okay. And do you have any reason to believe otherwise?

A I no reason to believe -- yes, I do believe there's some value to it.

Q But you don't even know what they are; is that fair?
A That's fair.
Q Okay.
A I don't think the Court in California knows what they are right now.
Q So -- okay. Have you ever seen the trade secrets written down anywhere?
A Since I don't know, I think that's self-explanatory.
Q Fair enough.
Is it your understanding that all of the trade secrets that are being sold are the subject of the California litigation or is a subset of the trade secrets?
A I'm not familiar with the litigation in California.
Q But you're selling at 10 percent in the net Harbinger recovery, but you're not familiar with the litigation?
A I know the litigation exists and I know it's been going on for two years and I know they survived a motion to dismiss.
Q Okay.
A I know that on April 2nd, that the Court ordered Harbinger and the debtor to provide discovery. So it's taken two years to get discovery; that's what I know.
Q Okay. Did you obtain any advice -- just a yes-or-no question; I don't want to know what the advice is -- but did you obtain any advice concerning the validity of the trade

secrets?
A No, other than they believed it was a meritorious case.
Q Okay. And the person who told you that was the Munck Wilson firm, do I have that right?
A Correct.
Q Okay. Did you make any effort to see, just to speak with Harbinger's counsel to see if there was a different side to the story?
A No.
Q Okay. Are you familiar at all with Harbinger's defenses in the case?
A No.
Q Do you understand that that litigation has nothing to do with patents or trademarks?
A I have no idea.
Q You don't know the scope of the intellectual property?
A Well, yeah, I didn't know about the litigation, what is involved in the litigation.
Q Okay.
A I answered that.
Q Okay. So, is it fair to say, then, that you never disclosed to any prospective bidder what the trade secrets were?
A I did not and I'm not aware of anybody asking.
Q But that information wasn't made available to

prospective bidders; is that fair?

A Not to my knowledge.

Whether my counsel did, I do not know.

Q Okay. As the trustee, as the estate fiduciary sitting in the witness box, you have no knowledge that the trade secrets were ever identified for any prospective bidder, correct?

A That's correct.

Q Okay. Thank you.

Just to finish up the last part of the *quid pro quo*, the buyer is willing to absorb at costs that it incurs in cooperating with you in connection with the prosecution of the claims, correct?

A That's my understanding.

Q But the estate is going to bear the burden of the actual out-of-pocket costs of the litigation; is that right?

A It comes off the top.

Q Okay. But you -- and if you lose the litigation and our proof of claim is ultimately sustained because the Court awards attorney's fees, that's going to be another expense of the estate, correct?

A File a claim.

Q We did file a claim?

A It's unliquidated.

Q Okay. So, you would agree with me that there's no

obligation on the part of the buyer to pay its *pro rata* share of the expenses for its *pro rata* share of any damage award that may be awarded to Harbinger; is that correct?

A I don't understand.

Q Did you negotiate for the buyer to pay its *pro rata* share of the expenses that the estate is otherwise going to be obligated to pay?

A I didn't negotiate that, no.

Q Did you even ask for that?

A I would have to refer to my counsel; I wasn't involved in those negotiations.

Q Did you ask the buyer to step up and be responsible for its *pro rata* share of any attorney's fees that may be owed?

A All I know is the negotiations with the buyer took place over at least 30 days, starting from the day of the bankruptcy filing in the January. Mr. Felger already advised Judge Shannon it was hard fought negotiations, back-and-forth, many, many, many, many times that was finally agreed to by counsel and myself and the buyer. So it is what it is.

Q Okay.

MR. MORRIS: I have nothing further, Your Honor.

THE COURT: Very well.

Why don't we do this, we'll take just a five-minute break and then we'll reconvene for any redirect or any other examination.

Mr. Burtch, do not discuss with testimony with anyone during the break.

Stand in recess. Five minutes.

(Recess taken at 12:49 p.m.)

(Proceedings resumed at 12:58 p.m.)

THE CLERK: All rise.

THE COURT: Please be seated.

Mr. Burtch, I would remind you, sir, you remain under oath.

THE WITNESS: Yes, Your Honor.

THE COURT: Mr. Felger?

MR. FELGER: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. FELGER:

Q Good afternoon, Mr. Burtch.
A Good afternoon.
Q Just a couple of, I think I have just a couple questions.

So, on cross-examination, you were referred to the APA, page 5, the definition of intellectual property, do you recall that?
A Yes.
Q And that includes the trade secrets in that definition; is that correct?
A Yes.

Q And did you retain Hilco Global to perform an appraisal of the intellectual property owned by the estates?
A I did.
Q You did.
And did Hilco have any questions or concerns, need any additional information before providing you with their appraisal of the intellectual property of the estates?
A Not to my knowledge.
Q And did they, in fact, speak with representatives of the debtors and inspect the three main facilities of the debtors before rendering their opinion of value?
A I understand that's correct.
Q And is there -- did you include that valuation of the intellectual property in your declaration that's before the Court today?
A I did.
Q Okay. Thank you.
And do you recall the questioning about your knowledge of the trade secrets of the debtors, do you recall that line of questioning?
A Yes, I do.
Q And is it true that you've received a number of memorandum, privileged memorandum from the Munck Wilson firm explaining the underlying litigation and the position of the Plaintiff and the Defendant --

THE COURT: Before --

BY MR. FELGER:

Q -- in that litigation --

MR. MORRIS: Objection. (Indiscernible.)

THE COURT: Before the witness answers --

Oh, I thought you were objecting that he's about to open the door to attorney-client privilege?

MR. MORRIS: Depending on what the answer is.

THE COURT: That, too?

MR. MORRIS: That, too.

(Laughter)

MR. MORRIS: Depending on what the answer is.

(Laughter)

THE COURT: You should rephrase this question, because if -- I am worried that you're going to wind up putting them in and I know it's not either your or Mr. Burtch's intention. I'm not going to control your examination, but you were leading as well, so I'll sustain that.

MR. FELGER: Okay. I'll strike the question for a number of reasons. Thank you, Your Honor.

THE COURT: Yeah. Well, I just didn't want to necessarily spar over that. The examination raised some questions about his assessment of the litigation and I just think that the witness should be cherry about dealing with

the attorney-client communications that he's had. It's a pretty proposition for --

MR. FELGER: No, and it's not that important, so I will stop there, Your Honor.

THE COURT: Okay. All right.

MR. FELGER: Thank you.

THE COURT: Any recross?

MR. MORRIS: Very brief.

RECROSS-EXAMINATION

BY MR. MORRIS:

Q The Hilco appraisal --

A Yes.

Q -- did you read it?

A Yes.

Q Does it say -- does it identify trade secrets?

A I don't think that it does identify trade secrets because there's only one person who knows what the trade secrets are -- no, maybe two: Harbinger and the debtor in the litigation.

MR. MORRIS: I'm going to move to strike the "Harbinger," Your Honor; he's got no personal knowledge. That's why we're serving a 30(b)(6) deposition notice, but otherwise, I have no further questions.

THE COURT: Stricken. No further redirect?

MR. FELGER: None, Your Honor.

THE COURT: Thank you, Mr. Burtch.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: I think we're at argument, right? All exhibits have been dealt with. There don't seem to be any issues with the exhibits that the witness has been directed to. I can treat all of them as being admitted.

Is that -- Mr. Morris?

MR. MORRIS: We have no objection to any of the debtors' exhibits.

THE COURT: All right. So those are exhibits -- I think our record --

MR. MORRIS: (Indiscernible.)

THE COURT: Very good. I think our record is clear and I think we're on to argument.

What I think would be helpful, frankly, would be to hear Mr. Morris' argument, because Mr. Felger's argument was, a lot of it was made in connection with the opening and so I think it would be more practical. I realize it's a little out of order, but I think this is where we are.

Mr. Morris?

MR. MORRIS: Whatever you prefer, Your Honor.

THE COURT: Sure.

MR. MORRIS: This is really simple. That section in -- that sentence in Section 7.3 needs to be stricken.

THE COURT: So let me ask you a question about that.

MR. MORRIS: Uh-huh.

THE COURT: It would not be unusual for a trustee to reach an agreement with a secured creditor that says I've got liens on everything and if you're going to move forward, Mr. Trustee, and settle the case, I get to consent. I know where you're going and I want you to tell me what the distinction is.

MR. MORRIS: The distinction is that this is not a secured creditor; he's credit bidding. He's not a secured creditor.

THE COURT: So --

MR. MORRIS: He's not a creditor at all, frankly.

THE COURT: So, how do I -- I think Mr. Felger is going to tell me this creditor has bought 10 percent of the value of this, so that's an asset that he purchased. And I think part of the testimony or it may have been the argument, was the purchaser was interested in buying the entire lawsuit and I make no comment about champerty and maintenance or anything else or transferability of claims between commercial parties, but if the purchaser says, if this case goes forward, I own 10 percent of the value of this lawsuit and, therefore, it's not a crazy thing for me to say you can't settle this, how do I deal with that?

MR. MORRIS: A few different ways, Your Honor.

THE COURT: Okay.

MR. MORRIS: First of all, I think it should be stricken because I don't think the trustee can delegate his fiduciary duty over the disposition of the estate asset. There's 40 percent of this net Harbinger recovery that is the estate asset, as opposed to a secured creditor where you're dealing with the secured creditor's asset or the buyer's 10 percent interest here.

There's 40 percent of the net Harbinger recovery, which, you know, we believe will be zero, but be that as it may, there's 40 percent of the net Harbinger recovery that is an estate asset. I don't believe that it's legal to allow a third party to have veto rights over the trustee's duty under 704 to dispose of the asset.

What I would say, Your Honor, and I've been authorized to say this during a break, is that if you wanted to limit the consent right to the injunctive relief, we'd be okay with that, because they're never going to get an injunction. The case has been pending for more than two years. They've never moved for a temporary restraining order. They've never moved for a preliminary injunction. We have no fear of that.

So, you know, if that's a way out of this, fine, because that's of no moment. But the economic portion, I

just don't think can ever be delegated. And, you know, you've heard the testimony here, the trustee has never done it before that he can recall. He's never seen anybody approve it before and there's no reason to do it here.

Why would -- I don't even understand why the trustee would say, You know what? I've got 40 percent, you've got 10 percent. But I promise not to settle, unless you say it's okay.

The one with the biggest stake, the law firm, doesn't have consent rights. It just doesn't make sense.

THE COURT: Well, they couldn't as a matter of professional responsibility.

MR. MORRIS: Right, I understand.

So, then, that moves to the -- unless Your Honor has any other questions on the consent right?

THE COURT: No.

MR. MORRIS: With respect to the trade secrets, there's two fundamental problems with it. I don't know how a trustee can exercise reasonable business judgment in selling an asset that he can't identify or value. He doesn't know what it is.

It's true that trustees oftentimes sell assets as-is, where-is, but you know what the asset is. So, I can sell a truck and I can say, I make no representations or warranties about the quality of the asset, the value of the

asset --

THE COURT: But assume --

MR. MORRIS: -- but he doesn't even know what he's selling.

THE COURT: I don't think that's remarkable. Purchasers purchase all the tax attributes, for example, of a debtor and the trustee is like, the trustee may or may not have his own tax professionals go in. But I've had many cases where the trustee came in and said, we didn't have any money to operate this case. Somebody came in and offered to buy it lock, stock, and barrel, and included in that are tax refunds that they may have or any other assets.

And trustees just say, based upon what I'm looking at, nobody's offering me more. And that's usually the primary consideration, not whether or not I have valued this and I think, you know, something? I think that this stuff is worth a lot. It's actually a much more, you know, red and tooth and claw exercise where the trustee says, Who's offering me money?

MR. MORRIS: You actually put your finger right on it and that is the other side of the coin. On the one side of the coin, the trustee has no idea what he's selling. On the other side of the coin, because of that, this is a sale motion, right, because of that, no prospective buyer had an opportunity to consider what those assets were --

THE COURT: Mr. Burtch's testimony --

MR. MORRIS: -- whether they were valuable. Only the buyer has it.

THE COURT: Mr. Burtch's -- hang on.

MR. MORRIS: So the buyer is getting something.

THE COURT: Mr. Burtch's testimony was "no one asked." Not that the information --

MR. MORRIS: We did.

THE COURT: -- was withheld.

You're in litigation.

MR. MORRIS: But we have a right to it. I mean, that even begs the question even more, because they've been ordered to tell us what it is.

THE COURT: And they will in the litigation.

MR. MORRIS: But, perhaps, if we had known this in advance, if there are any such trade secrets, we could have taken it into account.

Your Honor, I don't want to belabor the point.

THE COURT: No, I understand.

MR. MORRIS: You know, we've done this many, many times. The issue is what the issue is. The trustee has no idea what he's selling. He has no idea if they're valuable. There's no prospective bidder who had an opportunity to counterbid on this asset. This is an insider transaction. It's -- you know, that's what it is and I find that

objectionable.

THE COURT: I understand.

MR. MORRIS: And the last point is just a straight economic point. How do you not -- if you're going to sell the guy 10 percent of the asset, how do you not make him take 10 percent of the liability? It's not more complicated than that.

I have nothing further, Your Honor.

THE COURT: Very good.

Mr. Felger?

MR. FELGER: I guess the first thing I would say, Your Honor, is one of my first calls after we reached this agreement with Mr. (Indiscernible), client, one of my first calls was with Grant Sandler, inviting him and urging him to jump in and make an offer, being that they were in this hard-fought litigation, most likely, other party, in my humble opinion, to want to come in and bid on these assets.

And he accepted my invitation, signed an NDA, jumped in with a number of, a battalion of people into our data room, spent hours in our data room looking at over 9,000 documents. In the end, he did not make a bid. So I think that speaks volumes. They could have bid. They could have paid more. They could have had a different deal. They could have gotten rid of the Harbinger litigation and they decided not to.

So, again, focusing on this Harbinger piece of this much-bigger deal, I don't see anything wrong with the consent-right piece of this. Like Your Honor said, we're selling a 10 percent interest in that litigation. We're partners in that because we need Mr. Aquila and his people to be invested in that litigation. They know the facts. They know the facts. They will be the most important witnesses in prevailing on that litigation.

I mean over 30 former employees of Canoo went over to Harbinger; it's a massive, massive move of personnel and know-how and I expect it's going to take a while, unfortunately, for that to go through the system. But that's what we were considering, Your Honor, that from the initial offer was, they wanted to buy and take over the Harbinger litigation. From our perspective, it's very difficult to put a value on that, so this is how we dealt with it. We dealt with it by partnering in the success of that litigation. They have a piece of the monetary recovery and they have a say in the settlement.

The reason they press so hard on that is because of the injunctive aspect of it. They're buying the intellectual property, prevailing on that piece where the injunctive relief is critical for them going forward to maximize the value of the assets.

THE COURT: So, I want you to directly address the

question of whether or not Mr. Burtch, consenting to allow -- I think the question was really well-posed to Mr. Burtch and I'd like your response. The question was, suppose you get an offer that you really like that you think would be really great for all the creditors, a boxcar of money from Harbinger to resolve this litigation, you are precluded from agreeing to that, even though you think that that would be best, because you've given WHS, the purchaser, a veto.

Is -- and his question was, isn't that a violation of your duty to the creditors. I'd like your thoughts. Mr. Burtch answered the question, but I'd like your thoughts.

MR. FELGER: Yeah, it's -- again, I'd look at it as a negotiation and if we get to that point, we'll probably be mediating that issue. We contemplated that. We talked about that. And, you know, with our special litigation counsel, we have the same issue, in terms of valuing the injunctive relief and whether there's any recovery for special litigation counsel, with respect to the injunctive aspects of that litigation.

So, we fully discussed and understand that we could get into that situation where there's a settlement conference or a mediation. I mean, frankly, I don't see this case settling, given what I've read and heard, but if it does, we understand that we're going to have to come together and negotiate with our special litigation counsel and with

the buyer to figure out how we move that forward.

I've had many mediations where I've been in D&O cases and we have three or four claimants and we get a sum certain being paid and we had to all do a separate negotiation to figure out how to allocate all of that money.

In the end, I think it's a good problem to have, but, again, it was a situation where we pushed and we pushed back and the deal wasn't going to get done without this sort of accommodation on that particular asset that was being sold.

THE COURT: All right. Can I hear from the purchaser?

MR. CLARK: Your Honor, the purchaser came in and negotiated for -- Your Honor said it first, that is, the purchaser's preference in this deal was to buy the entire litigation, complete control, 100 percent ownership, and the trustee, and as trustees are required to do, pushed back and negotiated for something less.

If the trustee could sell the entire claim, all the consent rights -- not a shared consent right, but all the consent rights -- which he clearly could do, he could sell a portion of it and subject to consent rights. And if we ever got to the hypothetical situation, there are no facts to indicate that the trustee and the buyer are going come to loggerheads over whether this case should settle for 10

million or 20 million or 50 million. But if it ever got to that, ultimately, the contract says what it says and both sides have to operate in good faith in implementing the contract.

And I think what Mr. Felger says is correct, if you ever got to where there was a concrete proposal on the table to settle the litigation, that the trustee and the buyer couldn't, at least in the first instance, agree to, you probably do end up in a mediation with the retired bankruptcy judge or the like.

So, look, I understand that my words -- I'm a partisan in all of this.

THE COURT: Of course.

MR. CLARK: The trustee is not; the trustee is clearly, as counsel said, is a fiduciary for the estates and as he exercises his fiduciary duties and applies his reasonable business judgments with the basis to do so -- he's got the Hilco valuation -- there's no basis for Harbinger or anyone else to second-guess the deal that he cut. And it's a deal that pays in today's money, something like 17-plus-million dollars of real value. That's the bird in the hand and it shouldn't be upset because there might be two in the bush somewhere down the road, two or three years into the trade secrets litigation in California.

Thank you, Your Honor.

THE COURT: Okay.

MR. MORRIS: Your Honor, if I may, just briefly one minute?

THE COURT: Please.

(Pause)

MR. MORRIS: It's lovely that they think that someday in the future, if they don't agree on a disposition of the net Harbinger recovery that they'll go to mediation and come to an agreement.

THE COURT: Yeah.

MR. MORRIS: That's not an answer.

THE COURT: I think I'd like your thoughts on Mr. Clark's point that the trustee has the power to dispose of this asset in full.

MR. MORRIS: Correct. And if he did that, that would be perfectly fine. We would not be here today.

But what he's done is he hasn't -- that's not what he's doing. What he's doing is he's selling a teeny, tiny piece of it, 10 percent. He's keeping 40 percent and he's telling Mr. Aquila, You tell me what to do with the estate asset. That's what's different about it.

What really should be happening here is that sentence should be stricken and if the trustee believes that there's a reasonable settlement proposal on the table, one that he believes is in the best interests of the estate, he

should file a 9019 motion and the buyer can object if he thinks it's an improper exercise of the debtors' business judgment.

It's really simple. There's no reason for the trustee to be surrendering his fiduciary duties here. Thank you, Your Honor.

THE COURT: All right. Here's what we're going to do. There are a number of objections that are pending that the Court has not received a report on. I appreciate that they've been resolved, but I expect that some of those objectors may wish to weigh in and I don't know if the parties want to walk through the form of order.

I will deal with the Harbinger objection and then I will deal with the motion, the underlying motion. I will overrule the Harbinger objection and I will make some observations that are consistent with the Court's ruling to come on the motion to sell overall.

But I note as a threshold matter that the trustee is, again, entitled to substantial deference in the exercise of his business judgment. The Court is certainly familiar with Mr. Burtch over many, many, many years and many, many, many cases and Mr. Burtch has testified both, through his declaration and live testimony to the process that he employed in connection with this case.

Harbinger complains of three separate aspects of

the transaction that are before me, all of which, I think, are supported by the exercise of the debtors' business judgment and certainly are not inconsistent with his fiduciary obligations. I start with the consent rights and I understand that that is a significant concern and consideration for Harbinger as the Defendant in the litigation. But I don't think that that proposition impairs the trustee's ability to monetize that asset in a way that he believes is in the best interests of all creditors and in a way that is consistent with what the purchaser would be willing to pay.

And, again, I made a comment that this is not a transaction that the Court views in the hypothetical and the trustee looks at not only at the assets that he or she is administering, but in who is interested in purchasing them. There is a burn cost with every case, a significant one in this case, so there is a matter of speed.

And I've had cases where trustees have come in days after appointment seeking to selling assets. Courts -- this Court, in particular, me, generally, approaches trustee-proposed sales and their timelines and mechanics with a much lighter hand and a great deal more deference than I would in the context of a Chapter 11, so I start with that framework.

And, here, the trustee has identified an asset, being the Harbinger litigation; that asset was obviously the

subject of negotiation and dialogue between the trustee and the purchaser and they've come to an arrangement with a sharing, which, again, I'm prepared to approve, but also a consent right. I don't believe that the distinction between a creditor, a secured creditor who says you and I are going to have to agree on this, on the settlement, and a purchaser who buys some of the rights in a lawsuit, I don't believe that that's a dramatically distinct circumstance, and I certainly don't believe that the trustee's agreement in his judgment to accept significant proceeds in a transaction and leave open the proposition that we could have issues in the context of a sale, I don't believe that that's a violation of his fiduciary duty; that's the sort of judgment call that trustees are making. Sometimes it turns out poorly. Sometimes it turns out fine. But the trustee is entitled to make that determination and he has done so here.

Likewise, there is a concern that the buyer, while receiving a 10-percent return, is not providing anything meaningful in value, and, again, the record here indicates that this litigation is significant to the estate. There's significant value that Mr. Burtch believes is attributable to this litigation, but it has to be prosecuted and the cooperation and assistance of the purchaser, it seems to me, is necessary in order to effectively prosecute that litigation.

So, the commitment to cooperate, and on their own costs, to go through what will likely be additional discovery -- litigation is expensive -- and so I don't minimize the fact that they're not necessarily paying their share in the event of an adverse result. I'm not satisfied that that is actually the case here, and in any event, even if it were, it is one piece of a larger negotiation as to which the debtor -- the trustee has determined that meaningful and significant value is coming.

And, finally, as to the trade secrets, that's a challenge to the adequacy and sufficiency of the sale process and I don't believe that it has legs. The fact is here that it was no secret that the debtor has significant litigation relating to trade secrets; that's pending. It was the subject of negotiation and, presumably, the subject of discussion with every potential purchaser.

The trustee has advised that he has not done a deep investigation. He has spoken to Defense counsel, but when asked what the trade secrets were, he said whatever they are, I'm prepared to sell them, and that's what trustees do.

And so, I am not troubled by the issues raised by Harbinger in connection with the trade secrets. And I ascribe significance, again, to the point that there is no report that any party, other than Harbinger, that did due diligence asked for further information with respect to the

trade secrets. So, to the extent that there's a concern or an allegation that there was a defect or a flaw or an unfairness or a tilted playing field in connection with the sale process, I don't believe that there is anything in the record that would support a challenge to the integrity of the sale process.

So, based upon that, I would overrule the objections of Harbinger.

Before I turn to the motion itself and rule, I think I would want to provide any parties that wish to be heard in connection with their own objections, the opportunity to be hearted. I did get, yesterday, the revised form of sale order, which, again, helpfully, provided a blackline that showed where a number of the objections have been resolved.

I think, Mr. Felger, my first question to you was: Where are we with those other objections? Because each one of them is a standalone issue. You advised that they had been resolved, but I want to make sure that any party that wished to be heard has an opportunity before we turn to the substance of the motion.

Counsel -- I have counsel on -- Mr. Zuber, good morning, it's good to see you -- or good afternoon -- I have counsel approaching the podium. I'll hear from you in just a moment.

MR. ZUBER: Thank you, Your Honor of.

THE COURT: Sure.

Counsel?

MR. BEST: Good afternoon, Your Honor.

Brendan Best of Varnum, on behalf of Cosma International of America, as well as affiliates of subsidiaries of Magna International, Inc.

And, Your Honor, we're part of the limited objecting parties that did resolve, so I'll be brief, but I did want to confirm the resolution. I wanted to thank Mr. Felger and Mr. (Indiscernible) for working with my client, as well as four or five other similarly situated parties that have resolved. Those resolutions are embodied in the redline sale order that you received.

The one open item is, as Mr. Felger said, the date at which we would come back if there wasn't a resolution. And just to sort of --

THE COURT: Is this a cure issue?

MR. BEST: What's that?

THE COURT: Is this a cure issue?

MR. BEST: Your Honor, its partially -- cure issue is one of the issues related to a contract assumption but just to explain overall I will just give you this brief background of my client. My client is a global tier one automotive supplier and it was hired by Canoo to build

approximately 70 special tools that were going to be used to produce parts that were going to be used in Canoo vehicles.

Canoo defaulted on those purchase orders and Cosma alone, of all the Magna affiliates, is owed more then $8 million and its incurring significant regular costs, monthly costs, related to the work that had been performed at the time when Cosma defaulted. Cosma and Canoo also entered into modified terms and conditions which clearly stated that title to the goods that were the subject of the purchase orders did not pass unless they were paid in full. They were modified -- we entered into modified terms and conditions to their standard terms and conditions.

So, its clear, at least in our mind, the property that we're talking about, which was originally intended to be incorporated in this sale, is not property of the estate, its property of Cosma. That was the argument that we and other objecting parties raised in those limited objections. And the --

THE COURT: I will say, I liked all the references to the Whitehall Jewellers case. So, that was Judge Gross's case and his Chambers used to be across the street -- or across the lobby and when that case happened Whitehall was a consignment issue and Whitehall came in and said we will just sell everybody's stuff and then we will figure out who actually owns it which drew the kind of response you might

anticipate.

Anyway, I knew nothing about the case, it was the second day hearing and they were proposing to sell it all. I walked out of my Chambers into that lobby and all hell broke loose. There were more Hasidic diamond merchants shouting at debtors counsel and at everybody that would listen about the fact that they wanted their diamonds back. Judge Gross navigated the hearing and wrote his opinion but I will never forget that scene.

MR. BEST: Well, you could have had something like that today. It would have been angry automotive suppliers screaming that, you know --

THE COURT: Its base industry people, come on.

MR. BEST: So, Your Honor, when Canoo and my client over years Canoo attempted to resuscitate these purchase orders, promised that they would come up with more money to pay my client over $8 million. It never came to fruition. It's a source of immense frustration to my client because, again, they had to acquire massive amounts of steal, other raw materials, you know, there's partial production of these parts. There is literally a warehouse full of these parts and they paid tens of thousands of dollars every month just to store the parts.

So, it's a sense of immense frustration and when the Chapter 7 case filed there was a brief hopeful period

that maybe the nightmare would be over and they would be able to kind of move on. When the insider buyer came to sort of suggest that this property might be property of the estates, they filed schedules that listed over 600 different items that my client owns as what they called estimated assets. I have never seen that term used in a schedule before but, obviously, that plus the APA when it was filed caused us to make limited objections and many other parties.

THE COURT: So, your rights are reserved. I will say in terms of concern about hearings I don't know whether we scheduled hearings but all parties can expect that the Court will find a -- you will find a willing partner in the Court in terms of scheduling to the extent that you need it. These are usually business negotiations and if it goes off the rails you will have no shortage of opportunity to get to the Court.

MR. BEST: Thank you. That was one item that was a big concern for these objecting parties. So, if April 23rd is the deadline to, you know, hopefully, optimistically come to a resolution then we would really be looking for a Court date April 30th.

THE COURT: I think we would be able to accommodate that. Just coordinate with counsel and we will be able to deal with that but I don't know -- Mr. Felger, do you have dates scheduled in April or early May?

MR. FELGER: I don't think so, Your Honor.

THE COURT: Ms. Bello will certainly accommodate. So, I am going to allow the business process to play itself out but you're going to need further hearings anyway. So, we will be happy to provide the Trustee with additional dates.

MR. BEST: Okay. Thank you, Your Honor.

THE COURT: Very good. Thank you.

Mr. Miller, like a bad penny.

MR. MILLER: I keep coming back. Your Honor, very briefly. I represent Altair Engineering, Inc.

We did file an objection. I have my co-counsel, Eric Chafetz, from Lowenstein on the phone and he will briefly address the Court.

THE COURT: Mr. Chafetz, good afternoon. Its good to see you.

MR. CHAFETZ: You as well, Your Honor. Its 1:30 already.

Very briefly, we do represent Altair Engineering. We are in a similar boat as Mr. Best's clients. We provided the debtors with an appliance that included certain software and then certain ancillary software, license rights. Those assets were not purchased eventually out of the sale. We, obviously, had our position that the appliance itself was never property of the estate and the license, obviously, would be subject to our consent rights to be transferred.

We have been in touch with Mr. Felger and his colleagues in an effort to get the physical appliance back. We want to continue those discussions. We, obviously, would prefer not having to file a lift stay motion. We think its pretty clear from the underlying contractual documents that the debtor never had any title or interest to the appliance. That is really what my client wants back. And I just wanted to state that on the record and hopefully we can get this done by the upcoming April deadline.

THE COURT: Very good. Thank you, Mr. Chafetz.

Mr. Zuber, did you wish to be heard? Good to see you.

MR. ZUBER: Yes, Your Honor, briefly. Thank you. Good afternoon. I represent -- my firm Chiesa Shahinian & Giantomasi, we represent the Hanover Insurance Company which provided a few surety bonds to the debtor prepetition.

We filed a limited objection to the sale, essentially, taking the position that surety bonds are non-assumable financial accommodations under the bankruptcy code and cannot be assumed and/or assigned without the sureties consent. Ultimately, the buyer -- I spoke a number of times with the Greenberg Traurig Firm and they ultimately agreed with our position and that they had no intention of seeking assumption by the debtor or the Trustee and assignment of our bonds.

We also filed a motion for stay relief which was not opposed. An order has already been entered granting us stay relief so that we could terminate these bonds. Ultimately, we had proposed some language for the sale order which has now made its way into the revised form in Paragraph 26 and fully resolves our limited objection, essentially providing that the bonds will not be assumed and assigned and there will be no substation or principal. Essentially, the sureties rights are preserved. We anticipate those bonds will be cancelled shortly. They are relatively small and we certainly don't want to stand in the way of the approval of the sale.

THE COURT: Very good. Thank you, Mr. Zuber.

MR. ZUBER: Thank you, Your Honor.

THE COURT: Mr. Marsh, did you wish to be heard?

MR. MARSH: Yes, Your Honor. Thank you. Gary Marsh of Troutman Pepper & Locke. We represent CHEP Container and Pooling Solutions Inc., they're the largest pallet manufacturer company in the United States.

The debtor and Trustee are in possession of 68 pallets, which pursuant to CHEP's contract with the debtor are property of CHEP's. I did try to, you know, deal with this before the hearing. I wasn't able to really breakthrough. I know the Trustee and counsel are busy with the deal but CHEP -- you know, our rights are in the order

but its 68 bins and we're happy to sell them. I have given the Trustee a price. We are happy to come pick them up but its our property and we just want the buyer to know about it since they ran the company.

The pallets have a tendency to go missing and disappear often. CHEP has had that because they're movable and we would just, you know, like to get them back, sell them or we would file an admin claim if they're gone. But for the record I'm hoping we can resolve it.

THE COURT: Alright, you're rights are reserved and, obviously, will treat this as a business matter hopefully that can be resolved and to be resolved promptly. I understand your concerns.

MR. MARSH: Thank you, Your Honor.

THE COURT: Sure.

MS. BROWN: Good afternoon, Your Honor. Kim Brown from Landis Rath & Cobb.

THE COURT: Good to see you, Ms. Brown.

MS. BROWN: You as well, Your Honor. I am appearing today on behalf of Kasai North America. Your Honor, we join in the objections with respect to property rights issues. While we are happy to provide the purchaser and Trustee additional time to negotiate with them before we reach consensual resolution, time is of the essence. As everyday ticks by we continue to incur significant costs

including storage related to the tooling that we believe is not property of the estate.

So, while we are content to provide additional time, we would ask that any hearing that is scheduled to the extent parties are unable to reach a consensual resolution that it would be at the Court's earliest convenience and certainly no later than April 30th.

THE COURT: That sounds fine. Again, I am not going to schedule that right now but I would leave that to the parties and you have my commitment that we would have a prompt hearing.

MS. BROWN: Thank you, Your Honor. We appreciate that.

THE COURT: Any other parties wish to be heard?

(No verbal response)

THE COURT: Okay. The matter before the Court is the Trustee's request for an order authorizing the sale of estate property and I am going to grant that application. The Court has conducted an evidentiary hearing today and I would note that the record here has been certainly adequately developed by way of Mr. Burtch's testimony, his declaration, as well as under cross-examination, and also the record otherwise developed by the Trustee throughout the docket in this proceeding.

I have dealt with the Harbinger objection and I

have overruled that objection for reasons stated moments ago on the record. That leaves us then with, essentially, an unopposed sale transaction with rights of many stakeholders and contract counterparties being reserved for further negotiation, hopeful resolution, or a hearing that would occur promptly in the event that those negotiations do not bear fruit.

Case law teaches under the Abbotts Dairies case and its progeny in the Third Circuit that a trustee seeking to sell property of the estate needs to demonstrate that the proposed transaction reflects reasonable business judgment and that it is proceeding in good faith. And I am satisfied that Mr. Burtch has carried his burden on both counts.

As a threshold matter, this is a Chapter 7 case. The Trustee has not asked to operate the business and as a practical matter trustees sell assets. The Trustee has run a process that has resulted in a significant offer. The Trustee has testified at length regarding the extensive negotiations with multiple parties and the circumstances by which the Trustee has come to a final determination to sell to the purchaser today.

Again, the Trustee has demonstrated that based upon those negotiations and his estimation of the proceeds and value to be received in connection with that transaction that it is in the best interest of the creditors and

stakeholders. Therefore, I am satisfied that Mr. Burtch has demonstrated that this transaction is, in fact, in his best business judgment.

Likewise, I am satisfied that the proposed transaction is proceeding in good faith. Case law teaches that the good finding largely requires a determination that no insider is receiving an unfair or inappropriate benefit. Again, we have certainly an adequate and complete record developed today of the process by which Mr. Burtch, who has been doing this for a long time, undertook his assignment, has marketed the asset, has identified a purchaser. That purchaser is, again, fully disclosed. Mr. Aquila has a prior relationship with the company. That is necessary to disclose but not a barrier or impediment to the sale transaction that is before me. So, I am satisfied that the proposed transaction is proceeding in good faith.

In addition, based upon the record before me, I am satisfied that the purchaser has demonstrated that it is, in fact, a good faith purchaser and is, therefore, entitled to the protections attended thereto under Bankruptcy Code Section 363(m) and I would be prepared to enter an order so providing.

Mr. Felger, if you would confirm for me, I believe that the Trustee is also requesting a waiver of the Rule 6004 stay in order to close promptly. Am I correct?

MR. FELGER: That is correct, Your Honor. We are going to close, perhaps, tomorrow.

THE COURT: Based upon the record before me I am satisfied that cause has been demonstrated for a waiver of the Rule 6004 stay and I would admonish the Trustee to go forth and close. I would be prepared to enter your order. I think it has been -- I know I have seen the blackline, I don't know if the final version has been uploaded but I would enter that order as soon as it is uploaded.

Are there any questions?

MR. FELGER: Thank you, Your Honor. In Paragraph 25 of the revised order is a blank for that subsequent hearing after the 23rd. Do you want to fill in a date or --

THE COURT: Yeah, go ahead. Let's do the -- can we do the 28th?

MR. FELGER: That works for me.

UNIDENTIFIED SPEAKER: May I have a moment, Your Honor?

THE COURT: Of course. I can't really do the 29th or 30th, that is my problem. I have my 13's on the 29th and you want no part of that. The 30th I have hearings and then a program in Philadelphia. So, I can definitely accommodate on --

MR. FELGER: Is May 1st a possibility?

THE COURT: May 1st I could do.

UNIDENTIFIED SPEAKER: May 1st would be better.

THE COURT: Counsel. Ms. Brown.

MS. BROWN: Good afternoon, Your Honor. Kim Brown on behalf of Kasai North America again.

Your Honor, we would ask, if its possible, to have the hearing prior to May 1st so as we could hopefully cut off the continued incurrence of storage fees.

THE COURT: Okay, here is what we will do, I will schedule this for 1:30 p.m. on the 28th.

Mr. Felger, if, as this process plays itself out, you think you will need more of a hearing I would be happy to accommodate a hearing on the 1st or 2nd of May but I am sensitive to the concern of a creditor. I treat them like a landlord and nobody wants to roll over into the next month.

Also, experience teaches that the odds are about 95 percent that this thing resolve. Having never actually conducted a cure hearing I have some confidence in the abilities of counsel. So, I will leave that in your good hands. I will accommodate that scheduling request and that would, essentially, be a holding date for any of these issues that you have. Again, I realize its not ideal for the purchaser but, again, experience teaches that this probably is not going to necessarily be a necessary hearing.

If there are issues -- that is the other thing I guess I would say is if there are issues with this its

usually not a coin toss hearing. There is a question about who owns what, etc. So, if we're headed down that path my -- you have heard me give this speech I don't want letters, I don't want motions about stuff. If we have issues, I want you to get me on the phone.

I am assuming these will get resolved as a business matter because they usually do, but if not, it can be -- you can have recharacterization disputes, etc., which again are not necessarily, you know, a half hour thumbs up thumbs down kind of thing. I make no comment on the substance of it. I got some -- I have gotten color from the parties objections. So, you know, all of those rights are reserved.

Again, if you think you are headed to this we probably need more of a hearing then you would get, you know, on a typical Monday afternoon. So, again, I leave that -- I am in your hands about what is coming and you would just keep me posted.

MR. FELGER: I think of the 11 that are out there we are already down like four or five. So, hopefully, we will get them all done.

THE COURT: Alright, are there any questions?

Mr. Clark.

MR. CLARK: Not from the buyer, Your Honor.

THE COURT: Very well. Alright, I appreciate

everyone's time this afternoon. Again, I apologize for juggling the hearing a little bit on you. With that we stand in recess.

(Proceedings concluded at 1:45 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling April 11, 2025

William J. Garling, CET-543
Certified Court Transcriptionist
For Reliable

/s/ Tracey J. Williams April 11, 2025

Tracey J. Williams, CET-914
Certified Court Transcriptionist
For Reliable